### TILLEY *v.* COUNTY OF COOK.

1. Where there is no contract, express or implied, between the parties, usage or custom cannot make one.
2. A county and a city within its limits proposed to erect public buildings, the portion appropriated to the uses of each to be paid for by them respectively. They jointly offered a premium for plans. A. furnished one, and received the promised compensation. There was no further contract between the parties. The city and county severally adopted a resolution selecting his plan, subject to such modifications as might thereafter be determined upon if his estimate as to the cost of construction should be verified. He brought suit against them to recover five per cent of the estimated cost of the buildings. *Held*, 1. That he was not entitled to recover. 2. That evidence of the value of his services in making the estimate was properly excluded, inasmuch as he failed to show that they had been rendered at the instance of the defendants.

ERROR to the Circuit Court of the United States for the Northern District of Illinois.

The facts are stated in the opinion of the court.

*Mr. Melville W. Fuller*, for the plaintiff in error.

*Mr. William C. Goudy* and *Mr. Consider H. Willett*, *contra*.

MR. JUSTICE WOODS delivered the opinion of the court.

This was an action of assumpsit, brought by Tilley against the County of Cook and the City of Chicago. The declaration

consists of the common counts for work and labor done, goods sold and delivered, money lent and advanced, and upon account stated.

The following is a copy of the account sued on, which was appended to the declaration; —

" The COUNTY OF COOK and the CITY OF CHICAGO to THOMAS
TILLEY, <i>Dr.</i>

" For services as architect in preparing plans, drawings, specifications, diagrams, estimates, and details for the new court-house and city hall, and superintendence of erecting the same, five per cent on $2,909,629, the estimated cost of the building, the plan being that known as ' Eureka ' . . $145,481 45 "

The defendants pleaded the general issue.

By provision of the Constitution and laws of the State of Illinois, the county affairs of Cook County are managed by a board of commissioners of fifteen persons. Ill. Const. 1870, art. 10, sect. 7. The affairs of the city are controlled by the common council. Private Laws of Illinois, 1863, p. 40.

The County of Cook was the owner of a block of ground in the city of Chicago, known as the court-house square, on which it was proposed to erect a building to be used as a city hall and county court-house, in which the business of the city and county might be conducted.

On July 10, the board of county commissioners, and on July 15, 1872, the common council, adopted, each for itself, the following resolution: —

" *Resolved,* That it is the sense of the joint meeting that they recommend to the common council of the city of Chicago and the board of commissioners of Cook County that the city of Chicago and the county of Cook will authorize the building committees of the several boards to offer a prize of five thousand dollars ($5,000) for the best plan, two thousand dollars ($2,000) for the second, and one thousand dollars ($1,000) for the third best plan for a court-house and city hall, to be erected jointly by the county of Cook and the city of Chicago, upon the public square in the city of Chicago, the said plans to be submitted to respective boards, in conjunction with the board of public works of the city of Chicago."

On Aug. 5, 1872, the common council of the city and the board of county commissioners passed an order providing for a joint contract between the city and county for the erection of a building on the court-house square, and on Aug. 28, 1872, the contract was executed. It declares that it was for the public convenience that the courts and the offices of the city " should be located at some one convenient point and readily accessible to each other," and provides for the erection, by the city and county, of a public building on the court-house square, for the use of the county and city governments respectively, and the courts of record; that the general exterior design of the building shall be of such uniform character and appearance as may be agreed upon by the board of county commissioners and the common council of the city.

The contract further provides as follows : —

" 3. That portion of the said building situate west of the north and south centre line of said block shall be erected by the city of Chicago at its own expense.

" 4. The city of Chicago shall occupy that portion of said block west of the said centre line for a city hall and offices incidental to the administration of the city government, and for no other purpose whatever, except as hereinbefore provided.

" 5. Each of the parties will heat, light, and otherwise maintain and furnish its own portion of said building."

On Nov. 25, 1872, the building committees of the common council and the county commissioners published an advertisement calling for designs for the proposed building.

The advertisement declared that, in order to secure suitable designs, the city and county jointly offered the following premiums : For the best design, $5,000 ; for the second best, $2,000 ; and for the third best, $1,000.

It provided as follows : —

" Each design must have a device or motto marked on each drawing, and be accompanied by a sealed letter giving the name of the author, which will be opened after the final award is made, only for the purpose of ascertaining the names of the successful architects and for the return of the unsuccessful drawings to their authors.

" Each competitor will give the cubical contents of his building, and an estimate of the cost of the same complete."

Designs were submitted by a large number of architects, and the building committees of the city council and the board of county commissioners made a report awarding the prizes. Tilley, who had adopted for his drawing the word "Eureka" as the device or motto to distinguish it, was awarded the third prize, of $1,000.

On Aug. 4, the county board, and on Aug. 18, 1873, the city council, adopted the following resolution : —

"That the report of the majority of the joint committee awarding the prizes for plans of court-house and city hall shall be concurred in and the award confirmed, provided that nothing herein or in said report contained shall be construed as indicating a preference for either of said plans as to which shall be finally adopted, from which the said building shall be erected."

Tilley was paid the thousand dollars awarded to him as a prize.

Afterwards, on August 25, the county commissioners, and on Oct. 10, 1873, the city council, adopted the following resolution : —

"That the plan known as Eureka, or number 5 (five) in the collection, submitted for court-house and city hall, be, and is hereby, selected and adopted as the plan after which to build such courthouse and city hall (the board of commissioners of Cook County concurring), subject to such change and modifications as may hereafter be determined upon by the common council of the city of Chicago and the county board, provided the estimate of the architect who presented said plan as to the cost of construction of the building shall be verified."

Upon the trial of the case, the testimony tending to establish the facts above recited having been given in evidence by the plaintiff, he was sworn as a witness in his own behalf, and testified that he was an architect of fifteen years' standing, that he had made the design designated by the word "Eureka," and that, after the passage by the city council and board of county commissioners of the resolution last above mentioned, he had verified the cost of the construction of the proposed building in the way customary and usual with architects, which was made up at the rate of thirty-five cents per cubic foot for

the building, and was indorsed by fourteen or fifteen architects.

The plaintiff produced before the jury all his plans for which the prize had been awarded him. He offered to prove their value, the time employed and the expense incurred in the preparation of them. The court excluded the evidence so offered.

He further offered evidence to establish that by the usage and custom of architects, in the absence of a special contract, the superintendence of the construction of a building belonged to the architect whose plans were adopted. This was also excluded.

He also offered evidence to prove that by the usage and custom of architects, where prizes for plans were offered, the plans of the successful competitors belonged to them, and, if subsequently adopted as the plans to build by, were always paid for in addition to the prize itself. To this the defendants objected, and the court sustained the objection.

He also offered evidence to establish the value of the services rendered in verifying the cost of the proposed building according to the "Eureka" plans; to which the defendants objected, and the court sustained the objection.

This was all the evidence given or offered to be given in the cause.

The plaintiff then rested his case; whereupon the court directed the jury to find for the defendants.

The jury returned a verdict for the defendants, and judgment was entered thereon.

To reverse this judgment this writ of error was brought.

It will be observed that no evidence was introduced or offered to show that the plans of the plaintiff were used by the defendants, or either of them, or that the building for which they were used was ever erected.

It is clear that if the plaintiff has any right of action it must arise on the resolutions adopted by the board of county commissioners, Aug. 25, and the city council, Oct. 10, 1873. All that had taken place before those dates was the making of a contract between the city and the county, by which they agreed to join in the erection of a public building in the court-house

square, each party to build and pay for its own part of the structure; an offer by the city and county of three prizes for the best plans; an award of the prizes by which the third prize, of $1,000, was given to the plaintiff in error, with the distinct notice that " the award should not be considered as indicating a preference for either of said plans as to which should be finally adopted from which the said building should be erected; " and the payment to and the receipt by the plaintiff of the prize awarded him.

By the payment to the plaintiff in error of the prize, the defendants discharged every obligation due from them to him arising out of the preparation of plans for the proposed building. Upon that payment being made, no contract whatever, either express or implied, existed between the plaintiff and the defendants.

If, therefore, the plaintiff had any. right of action against defendants, it must have arisen by reason of the adoption of the resolution just mentioned, and what was done by plaintiff after its adoption.

The resolution was the voluntary act of the city council and county commissioners. It was not a proposition, but simply the expression of a purpose to build their structure after the plans of the plaintiff, subject to such changes and modifications as might thereafter be determined upon by the common council and the county board. The resolution was not adopted at his instance or suggestion. Suppose that the day after its adoption the resolution had been reconsidered and rescinded, would the defendants nevertheless have been liable for the value of the plans and for five per cent on the estimated cost of the building for superintendence, amounting in the aggregate to near $146,000 ?

Suppose a private person should announce his purpose to build a house after a design which he had seen in an architect's office, but before he begins the execution of his purpose changes his mind, never calls for or uses the plans, or even builds the house, is he liable to the architect for the value of the plans and for superintendence ? In such a case there certainly is no contract between him and the architect upon which a recovery can be based.

The claim of the plaintiff is that by the adoption of the resolution by the city council and the county board, without any act done or assent on his part, they were bound to go on and erect the building on his plans and expend $2,909,000, its estimated cost.

The resolution did not bind the plaintiff to furnish his plans and superintend the building. There was no mutuality, and, therefore, no consideration, — both of which are essential to a contract. Notwithstanding the resolution, the plaintiff might have said, I will not furnish my plans, and I will not superintend the building, and the defendants would have had no claim on him.

If one does not accede to a promise as made, the other party is not bound by it. *Tuttle* v. *Love*, 7 Johns. (N.Y.) 469. When A. signs a writing by which he declares he will sell to B. his house at a certain price, this is a mere proposition and not a contract. *Tucker* v. *Woods*, 12 id. 189.

In *Wood* v. *Edwards* (19 id. 205), where A. wrote that he had agreed to a substitute for an existing agreement which he would execute, Spencer, C. J., said the proposition of A. to execute the new agreement was not binding on him, as well on the ground of want of consideration as want of mutuality, since the plaintiffs on their part were not bound to execute the agreement.

In the case of *Kingston* v. *Phelps* (Peak. N. P. C. 299), the plaintiff proved that the defendant consented to be bound by an award to be made on a submission by other underwriters on the same policy, but the witness proved no agreement on the part of the plaintiff to be bound by the award. Lord Kenyon held that there was no mutuality, and therefore the defendant's agreement was a mere *nudum pactum*.

An offer of a bargain by one person to another imposes no obligation upon the former, unless it is accepted by the latter upon the terms on which it was made. Any qualification of or departure from them invalidates the offer, unless the same be agreed to by the party who made it. *Eliason* v. *Henshaw*, 4 Wheat. 225. See also *Webb* v. *Alton Marine & Fire Insurance Co.*, 8 Ill. 225; *Maclay* v. *Harvey*, 90 id. 525.

In this case, there being only an expression of purpose by one party to erect a building according to plans antecedently made by another, and no obligation entered into by the other party, and no plans used or building erected, there was no contract between the parties, either express or implied.

If we are correct in this conclusion, then all the evidence offered by the plaintiff to prove the value of the plans, and the time employed, and the expenses incurred in their preparation, was irrelevant and immaterial.

The only purpose for which such evidence could be admitted would be to prove the damage sustained by the plaintiff by the breach of his alleged contract with the defendants. But if he had no contract, express or implied, he was entitled to no damage, and could show none.

It is complained that the evidence offered to prove the custom of architects was excluded. We think it was rightly excluded.

Proof of usage can only be received to show the intention or understanding of the parties in the absence of a special agreement, or to explain the terms of a written contract. *Hutchinson* v. *Tatham*, Law Rep. 8 C. P. 482; *Field* v. *Lelean*, 30 L. J. Ex. 168; *Baywater* v. *Richardson*, 1 Ad. & E. 508; *Robinson* v. *United States*, 13 Wall. 363.

In all cases where evidence of usage is received, the rule must be taken with this qualification, that the evidence be not repugnant to or inconsistent with the contract. *Holding* v. *Pigott*, 7 Bing. 465, 474; *Clarke* v. *Roystone*, 13 Mee. & W. 752; *Yeats* v. *Pim*, Holt, N. P. 95; *Trueman* v. *Loder*, 11 Ad. & E. 589; *Bliven* v. *New England Screw Co.*, 23 How. 420.

The inference from these principles is inevitable, that, unless some contract is shown, evidence of usage or custom is immaterial.

The plaintiff says he was ready to prove a custom of architects, that when prizes were offered for plans of a building, the successful competitor remained the owner of his own designs, and if they were adopted he was entitled to compensation therefor in addition to the prize, and that, by the same custom, the adoption of his plans entitled him to superintend the erec-

tion of the building, and to the usual remuneration therefor. He claims, therefore, that in view of this custom, the adoption of his plans by the passage of the resolution referred to by the city and county boards, amounted to a contract, on the part of the defendants, to pay for the plans and employ him to superintend the erection of the building, and pay him therefor.

The offer of the plaintiff to prove certain facts having been rejected, he must be presumed to be able to prove what he offered to prove. We must, therefore, assume that the custom which he offered to prove did, in fact, exist. But what was that custom? Clearly, that if the building was erected according to the successful plans, the architect was entitled to pay therefor. That was such an acceptance and adoption of his plans as would give him the right to compensation therefor, and the right to superintend the erection of the building and receive the usual remuneration. The custom certainly did not bind the party who offered prizes for plans, after having paid the prizes, to pay also for plans that he never used, and for superintendence of a building that he never erected, merely because he had selected a particular plan and announced his purpose to build in accordance with it. If such were the custom and usage of architects in Chicago, it was an absurd and unreasonable custom, and, therefore, not binding. *United States* v. *Buchanan*, 8 How. 83.

If the plaintiff had offered to show that after the passage of the resolution by which his plan was accepted, the defendants had erected their building according to his plans, then the evidence of the custom would have been pertinent. But he made no such offer, and it is to be presumed no such fact existed. The evidence of this custom was, therefore, properly excluded.

The plaintiff complains that he was not allowed to prove the value of his services in verifying the cost of the proposed building according to his plans.

We think the court was right in excluding this evidence. There was no proof nor any offer of proof to show that the services of the plaintiff were rendered at the instance or request of the defendants or either of them. From all that appears, the

services were voluntarily rendered by the defendant, and no use whatever was made of the results of his investigation. The law, therefore, does not imply a contract to pay for them, and proof of their value was quite immaterial.

The evidence rejected was properly excluded on another ground. The defendants were charged in the declaration with a joint liability, but there was no privity between them, either by law or contract. The evidence offered was to show a joint liability. So far as it went it failed to do this; on the contrary, it was made to appear that each of the defendants was building its own part of the structure at its own expense, and for its own use. After the award and payment of the prizes they assumed no joint liability, as the evidence admitted clearly showed. And the evidence offered did not tend to establish a joint liability. It did not, therefore, support the case made in the declaration, and was properly excluded from the jury. As the plaintiff asked no leave to amend, this ruling of the court is not a ground of error.

We find no error in the record.

*Judgment affirmed.*