AMALGAMATED ROYALTY OIL CORPORATION v. HEMME et ux.

(Circuit Court of Appeals, Eighth Circuit. August 4, 1922.)

No. 6006.

**I. Equity ☞363—Allegations of fact, but not mere conclusions, taken as true on motion to dismiss.**

On appeal from judgment dismissing bill on motion, the allegations of fact in the bill, but not mere conclusions of the pleader, are to be taken as true.

**2. Brokers ☞94—Correspondence held to show agent had authority only to procure purchaser subject to approval.**

In action on contract for sale of oil lands, or royalty interest under lease thereon, correspondence between defendants and an agent *held* to show that the agent had authority only to secure a purchaser subject to defendants' approval, and had no authority to bind either defendant.

**3. Brokers ☞94—Letter to agent held not offer to sell royalty under oil lease for specified sum, but merely invitation for negotiations.**

Letter written by defendant to an agent, stating that he had not thought much of selling his royalty under an oil lease, asking how much the agent wanted out of it, and stating that it would take $125,000 to get it, was not a direct offer to sell for the sum mentioned, but only an invitation to open negotiations.

**4. Brokers ☞94—Correspondence held not to show completed contract of sale of royalty.**

Correspondence between defendants, owners of royalty interest under oil and gas lease, plaintiff's agent, and several real estate agents, concerning proposed sale of the land, or the royalty interest, *held* to show no completed contract of sale.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

5. Brokers ⚖=94—Offer to agent to "close the deal" on terms offered as to payment of money and its division held not to make completed agreement.

Defendants' alleged statement to an agent, attempting to effect a sale of oil lands or a royalty interest therein, after offer providing for certain payments to agents and payment to persons having an option on the land had been explained to him, that if the agent would bring the prospective purchaser to a certain place they would "close the deal" on the terms and conditions agreed on as to payment and division of the proceeds, did not make a completed agreement, as it limited acceptance to the matters stated, and left other terms open, and "close the deal" did not refer merely to the drawing and delivery of papers, and the necessary formalities in reducing a completed agreement to writing.

6. Equity ⚖=153—Plaintiff, alleging defendants owned land, could not claim on motion to dismiss that the wife had no interest as owner.

Where plaintiff, suing on alleged agreement for sale of land, or interest in royalties under lease thereon, alleged that defendants, husband and wife, were the owners of the land, it could not claim, on motion to dismiss the bill, that the wife did not have an interest in the land equal to that of her husband, especially in view of Rev. Laws Okl. 1910, § 3352, providing that neither husband nor wife has any interest in the other's separate property.

7. Brokers ⚖=94—Agent could not accept proposal without authority from principal, whether subject of sale was interest in land or not.

Whether an alleged agreement was for the sale of an interest in land owned by husband and wife, or only for sale of royalty interest under oil lease, a broker had no right to bind the wife by accepting proposals without express authority from her.

8. Pleading ⚖=8(18)—Recitals as to agency held mere conclusions.

In action against husband and wife on contract for sale of land, or interest under oil lease, recitals that the husband was acting for himself and as agent for the wife, and that a broker was the broker and agent of the defendants, were mere statements of conclusions, and insufficient to show the husband's agency for the wife, without allegations showing the scope of his authority, or that agency was of such general character as to enable him to make contracts for her.

9. Husband and wife ⚖=229(3)—Bill held insufficient to show agreement on part of married woman.

Bill in suit on contract for sale of land or of royalty interest under oil lease thereon, even if sufficient to show completed agreement as to defendant husband, held wholly insufficient as to the defendant wife.

10. Frauds, statute of ⚖=146—Bill held to show negotiations were for land, and not royalty interests under lease.

In suit on alleged contract respecting oil lands, the bill and the correspondence therein set out, between one of the defendants, plaintiff's agent, and several real estate men, held to show that the parties were negotiating for a transfer of title to the land, within the statute of frauds (Rev. Laws Okl. 1910, § 941, subd. 5), and not merely for an assignment of a royalty interest under an oil lease on the land.

11. Frauds, statute of ⚖=158(3)—Contract may be made by correspondence, but omissions cannot be supplied by parol.

A contract can be made by letters and written memoranda sufficient to satisfy the statute of frauds, but such writings must be in themselves sufficient to create the contract, without resort to parol evidence to supply omissions.

12. Frauds, statute of ⚖=118(3)—Correspondence held insufficient to satisfy statute.

Correspondence between an owner of oil lands, plaintiff's agent, and various real estate men, concerning a proposed sale of the land, held insufficient to satisfy the statute of frauds.

⚖=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the Western District of Oklahoma; John H. Cotteral, Judge.

Suit by the Amalgamated Royalty Oil Corporation against F. W. Hemme and wife. From a judgment dismissing the bill on motion, plaintiff appeals. Affirmed.

This case was determined in the trial court upon a motion to dismiss, for want of equity, the second amended bill of appellant. The court sustained said motion. Under these circumstances the allegations of fact, well pleaded, being accepted as facts by the court, it seems necessary to a clear understanding of the case that the statements of said second amended bill (hereinafter called "the bill") be set forth quite fully. It is claimed therein that appellees entered into an oral contract of employment with one William Stein, whereby said Stein was to procure a purchaser for their royalty rights in oil and gas produced and saved by virtue of a lease to one A. P. Crockett of a certain 80 acres of land in Oklahoma owned by them. This lease to Crockett is the usual form of oil and gas lease, granting to the lessee, his successors, heirs, or assigns, all of the oil and gas in and under the 80 acres of land, and also the said tract of land, for the purpose of entering upon and operating thereon, and removing therefrom oil and gas, and other matters usual and incident thereto. Said lease was for a period of three years from the date thereof, and as much longer as oil or gas were found on the premises developed. There are other provisions in the lease not necessary to be set out.

Appellant also claims in said bill that at the time of entering into the alleged contract with appellees about five oil wells had been developed upon the land, and the royalty rights under the Crockett lease had become fixed and determined; that said Stein procured a purchaser for the royalty, one J. H. Miller, who it is claimed was acting for appellant as an officer and agent, and who offered to pay the price claimed to have been agreed upon as a consideration by F. W. Hemme, acting for himself and as agent for his wife; that said offer of Miller was communicated to F. W. Hemme in a letter from Stein, and accepted by him by telephone. It is alleged that the proposition was to accept $125,000 as the agreed purchase price of the royalty rights of appellees. At the time of the negotiations between the parties there was an outstanding option or agreement between appellees and S. E. Chaney, Paul Webb, and W. L. Herring for the sale of the same land, which agreement had been assigned to the Interior Oil & Royalty Corporation. Suit had been brought in the state court of Oklahoma by appellees to cancel said agreement, but this outstanding agreement constituted a cloud upon the title of appellees, and it is claimed the matter was arranged by conference with the Interior Oil & Royalty Corporation, and adjustment was made providing for the payment of $4,000 to the Interior Oil & Royalty Corporation, $500 of which Stein was to take care of out of his commission, the balance to be taken out of the $125,000 which the Hemmes were to receive, leaving appellees $121,000 net.

Parties by the name of Whitehead and Bland figure somewhat in the transaction. Whitehead is alleged to be an agent of appellant, and was engaged in the real estate business. Bland was an associate of Stein engaged in like business. Certain correspondence between Stein and Hemme, Bland and Whitehead, and Miller and Bland appears in the bill and is so important that the same, consisting of letters and telegrams, is here set out; likewise the allegations of the bill relied on in connection therewith to constitute a contract. In chronological order the same are as follows:

Allegation, transcript of record, pages 2 and 3:

"The plaintiff alleges and says that on or about the 1st day of February, 1919, the defendants acting together, and the said defendant F. W. Hemme acting for himself and as agent for Mary Hemme, his codefendant, made and entered into an oral contract of employment, whereby the said defendants employed and constituted one William Stein their broker and agent for the purpose of procuring a purchaser for them of their royalty rights of oil and gas produced and saved from the above and foregoing real estate, by virtue of an oil and gas mining lease. * * *"

Letter, Hemme to Stein, dated February 1, 1919, transcript of record, page 6:

"Stillwater Okla 2/1 1919

"Mr. W. M. Steine

"Received your letter should say have not thought mutch of sellin my roilty in the first plase it is a good thing for me as it is brings me $4500 per month (2) I wonte know how much you wont out of it (3) it takes $125,000.00 to git it      Your Resp                                    F. W. Hemme."

Letter, Hemme to Stein, dated February 2, 1919, transcript of record, page 7:

"Stillwater, Okla 2/2 1919

"Mr. Wm. M. Stein,

"Reseaved your letter wood say maled your a letter yesterday and will say today there is a man in Tulsa that will probably give me $120,000.00 net & all cash the Day I will give him a Warrantee Deed of the pase that is not to me the reason I did not answer  I had no notion to sell it untill the last few days.  I have some trubel with them fellows that I give an option on the lease last year & tha Recorded the contract.  Now tha wont release it it will come up in a few days now it does not amount to anything but I cant give a clear title until it is Released them fellows have no right to hold it but tha wont sene money  tha payed me a little but nothing on the contract, only interest on the amount wile the contract wose alive.

"Yours resp                                              F. W. Hemme."

Letter, Stein to Hemme, dated February 3, 1919, transcript of record, pages 7 and 8:

"Feb. 3, 1919.

"Mr. F. W. Hemme, Stillwater, Okla.—Dear Mr. Hemme:  Wish to acknowledge receipt of your letters of both the 1st and 2d inst., and most carefully noted the contents thereof.

"I have two clients, one or the other of whom will buy your property this week.  The price that will be paid to you for it will be $130,000.00 and out of this amount will expect as my commission 5% or $6,500.00, which will lease to you a net amount of $125,000.00 cash.  One of these clients is Mr. A. Crockett of Oklahoma City, with whom I have just had a telephone conversation, and who of course, as you know, is thoroughly conversant with the entire situation regarding the lease and its earnings.  The other clients are in Denver, and it will take until Wednesday for me to know definitely whether he will take the property at $130,000.00  He has made me a offer for it of $118,000.00, but I believe I can get him to come up the extra $12,000.00.

"I need not tell you that Mr. Crockett will be able to handle this promptly, but I can assure you that my party is a man of equally as great means, and there will be no difficulty whatsoever in effect this deal.

"If I had been sure last week that I could have delivered this royalty, I could tell you in this letter that it is already sold, but of course, not hearing from you, there was some uncertainty on my part as to the situation, so could not advise my client as to what could be done.

"You will hear from me, Mr. Hemme, at the latest, by Wednesday or Thursday, and if you should come to Tulsa before that time I would like to have you come to my offices, and if I am not here see my associate, Mr. Bland, who is conversant with the situation as I am.  Mr. Bland is an attorney and knows all about the contract you had with those people, and attached absolutely nothing of importance to their claim.

"In case the price of $130,000.00 less 5% commission that you will pay me after the money is delivered to you is not satisfactory, I will of course want you to let me know at once, but as you stated in your letter yesterday it takes $125,000.00 to get it, and as I told you in my letter

#2—F. W. H.—2/3/19

of the 1st to let me know what price you will pay a commission of 5% on, I will be getting for you probably $5,000.00 more than you ever expected.

"With kindest personal regards, I am

"Very truly yours,                                      Wm. M. Stein.

"WMS/W

"P. S.—Early in January I also submitted your property to Mr. F. W. Perry, of the Perry-Wood syndicate, in the 1st National Bank Bldg. here.  After

282 F.—48

receiving your letters today I renewed negotiations and should have answer definitely in the next day or two. The price to these people has also been put at $130,000.00 out of which, of course, I will expect the 5% commission from you."

. Letter, Hemme to Stein, dated February 12, 1919, transcript of record, page 9:

"Stillwater, Oklahoma, Feby. 12, 1919.

"Mr. Wm. M. Stein, Tulsa, Oklahoma—Dear Sir: I am writing you regarding our deal and will suggest that you come to Stillwater in case you are still in the market for my place.

"If you decide to come will aske you to come not later than Sat. noon and phone me when you expect to be here so that I will not be out of town.

"I do not expect to make another trip to Tulsa, but prefer that our business be transacted here as my attorney and the bank I do business with are located here and I would like to get their advice regarding the matter.

"Yours truly,	F. W. Hemme.".

Allegation, transcript of record, page 9:

"The plaintiff alleges and avers that said royalty rights were [priced] to this plaintiff at the sum of $135,000.00, which your plaintiff orally and in writing agreed to pay as the purchase price for the royalty rights of the said defendants in and to said property and that in connection therewith there were further negotiations in the following particulars, to wit."

Telegram, Whitehead to Bland, dated February 13, 1919, transcript of record, page 9:

"1919 Feb 13 Denver Colo.

"H. O. Bland New Wright Bldg Tulsa Okla

"Have had consultation with Miller can make deal if you will divide your commission equally with me	Andrew Whitehead."

Telegram, Miller to Bland, dated February 13, 1919, transcript of record, page 10:

"1919 Feb 13 Denver Colo

"H. O. Bland 512 New Wright Bldg Tulsa Okla

"Have seen Mr. Whitehead will add one thousand dollars to commission providing you divide with Mr. Whitehead wire me if we can close deal on this basis	J. W. Miller."

Telegram, Bland to Miller, dated February 14, 1919, transcript of record, page 10:

"Tulsa, Okla., Feb. 14, 1919.

"Dr. J. H. Miller, 1st National Bank Bldg., Denver, Colorado.

"After consultation with Mr. Stein my associate, consent to divide commission three ways. Will therefore give twenty two hundred dollars to Whitehead, which added to your thousand makes thirty-two hundred to him. This is positively our limit. Must deal with Hemme by Monday. See Whitehead and if this arrangement agreeable wire immediately how you expect to close deal within time limit.	H. O. Bland.

"Phone 5762. 513 New Wright Bldg."

Allegation, transcript of record, page 10:

"The plaintiff alleges that in answer to the above and foregoing telegram the said plaintiff, through its officer and agent, J. H. Miller, accepted all of the terms and conditions laid down in said telegram, and in writing agreed to pay the sum of $135,000.00 for said property in the way and manner following, to wit: That $132,000.00 should be paid into the hands of the agent of the defendants and the defendants, and the remaining $3,000.00 was to be paid in commissions as set forth in the various correspondence and telegrams, and that such acceptance of said terms and conditions and the agreement to pay said sum of money was in writing and by way of a telegram, and was in words, letters, and figures as follows, to wit:

"'Copy of Mackay Telegram

"'177 Ks sn	1045 P. m. 47

"'Denver Colo Feb. 15–19

"'H. O. Bland 512 New Wright Bldg., Tulsa, Okla.

"'We accept your proposition and wish to close deal on basis of total pay-

ment by us one hundred thirty two thousand·dollars stop we accept our agreement regarding division commission stop please have abstract deed and necessary papers in readiness leaving denver tonight arrive Tulsa Monday morning.

"'J. H. Miller.'"

Letter, Stein to Hemme, dated February 18, 1919, transcript of record, page 11:

"Feb. 18, 1919.

"Mr. F. W. Hemme, Stillwater, Oklahoma—Dear Mr. Hemme: I am inclosing herewith deed as prepared by Dr. Miller's attorneys. If you will be here Thursday morning with same duly executed by yourself and wife, I know of no reason why we cannot finally close this deal."

Letter, Stein to Hemme, dated February 22, 1919, transcript of record, page 12:

"Tulsa, Okla., Feb. 22, 1919.

"Mr. F. W. Hemme, Stillwater, Oklahoma: Seems impossible to get you to answer telephone calls. You agreed to price for royalty, settlement with Interior people and amount commissions. We obtained release you asked for, have money ready and insist upon delivery title by Monday evening. Otherwise intend bringing suit immediately. Wire your answer today.

"Wm. M. Stein.

"Phone 5762. 513 New Wright Bldg."

Letter, Hemme to Stein, dated February 23, 1919, transcript of record, page 12:

"Stillwater, Okla., Febr. 23rd, 1919.

"Wm. M. Stein, Tulsa, Oklahoma—Dear Sir: I have your wire of yesterday, I was away from town one day and will have to stay close here. When I left you at Hotel Tulsa I told you I would go home and talk with my wife, and that she had to be satisfied before it was a deal.

"I have always told you it would be best to close here where we are and where the records are and I had bank write you to same effect.

"Now I want you to write me fully as to the last proposition you made me and state terms and everything, and at the same time put the full amount of your proposition to come to me up in the State Bank of Commerce of Stillwater. My wife and I have been going over the matter and we will know then that you actually mean business. My wife is not satisfied or perhaps does not fully understand all the things about the proposed deal and this will show up everything.

"Mr. J. W. Reece was in Tulsa Saturday morning and got the abstract from Gubser and Means but Saturday was a holiday and I guess you were not around the office. The attorney's opinion was not with the abstract but you can send copy over with the other matters. The president of the bank here is Joseph Dvorak.

"You all knew from the first about the old contract and agreed that that would not effect the deal. This of course was a disappointment to me and especially with Mrs. Hemme.

"Mr. Bland stated to Mr. Reece that the deal would be made by taking judgment in court here. Your wire states something about release.

"I do not know what the examining attorneys have require however.

"So write me fully your proposition, and the amount coming net to me on the proposition put up in the bank here at Stillwater.

"My wife and I have never seen one cent put up.

"So put up the money here on your proposition.

"There is no need of any phones.

"The bank here will notify me and when the money is up here at Stillwater, I will take my wife down to the bank and we will quickly decide on the matter.

"My wife must understand fully and be satisfied.

"Give my regards to Mr. Miller,

"Respectfully, F. W. Hemme."

Letter, Stein to Hemme, dated February 25, 1919, transcript of record, pages 13 and 14:

"February 25th, 1919.

"Mr. F. W. Hemme, Stillwater, Okla.—Dear Mr. Hemme: Your letter of the 23rd inst. reached me yesterday. Now Mr. Hemme, as to the money, it

is lying at the Producers State Bank, and has been there ever since Dr. Miller's last trip. It is in the account of the Dr.'s attorneys. Mr. Means, and if your bank wishes to call up Mr. Seger, Cashier of the Producers Bank, he will tell them so, and also that it is there for the purchase of your Royalty. Inasmuch as Dr. Millers' attorneys are here and also, as the Stillwater Bank of Commerce and the Producers State Bank at Tulsa are correspondents of each other, there can be no possible difference whether the money is here or at Stillwater.

"Of the money at the bank, $121,500.00 net is to be paid to you on the delivery of the deed signed by yourself and wife, $4,000.00 to be paid to the Interior crowd, $2,200.00 to the Denver brokers and $4,300.00 to myself and Mr. Bland. That makes $6,500.00 total brokerage instead of $7,000.00, the amount you agreed to pay as I am standing $500.00 of the $4,000.00 that goes to the Interior crowd for their release. In other words, you are getting $125,-000.00 and are paying $3,500.00 to the Interior crowd.

"Please bear in mind Mr. Hemme, that the buyers in this deal are not 'hot air' merchants, that the real money is up ready to pay and that Gubser & Means, as attorneys, are just as anxious as you are to have it so that when the deal is closed everything will be all right. You will have your money and be free and clear of the property at a very good price to you, with no comebacks, lawsuits, or anything, and Dr. Miller will have the property and know that there can be no future trouble. I will be the only one getting less than as originally expected.

"Inasmuch as you do not care to talk over the phone please let me know by return mail when you will be in Tulsa with the deed signed by yourself and Mrs. Hemme, at which time the deal can be [finally] closed.

"Awaiting your reply and with regards, I am,
              Very truly yours."

Allegation, transcript of record, page 14:

"The plaintiff alleges and says that the proposition to accept $125,000.00 as the agreed purchase price of said royalty rights of said defendants was fully accepted and performance tendered. * * *"

Allegation, transcript of record, page 16:

"That after the said defendants had received the above and foregoing letter from their said agent and broker, under date of February 25, 1919, explaining to them fully how the said $125,000.00, which they had agreed to accept for said royalty rights was to be paid, the said defendants notified said broker and agent to bring his prospective purchaser to Stillwater, Oklahoma, and to the State Bank of Commerce in said city, and they would there close the deal upon the terms and conditions agreed upon as to the payment of money and divisionally proceeds, and said notification was orally in a [telephone] conversation had and held on or about the 27th day of February, 1919, between the said broker and agent and the said F. W. Hemme, acting for himself and as agent for his codefendant."

Appellees refusing to make the conveyance demanded, this suit was commenced. Appellant asked the court to decree specific performance of the alleged contract, requiring appellees to execute and deliver to appellant a deed of conveyance of the said 80 acres of land, and upon failure so to do that the judgment of the court should operate as a conveyance of all the interest and royalty rights of appellees in the premises by virtue of the Crockett lease. Alternative relief is asked in damages of $365,000 in case the court does not render judgment for specific performance.

The trial court sustained a motion to dismiss the bill on the ground that the same did not state any matter of equity entitling appellant to the relief prayed for, nor that the facts as stated in said bill were sufficient to entitle appellant to any relief against the appellees either in law or equity.

J. M. Springer, of Tulsa, Okl. (E. G. Wilson, of Tulsa, Okl., and J. F. Sharp, of Oklahoma City, Okl., on the brief), for appellant.

Frank Dale, of Guthrie, Okl. (John P. Hickam, of Stillwater, Okl., and A. G. C. Bierer, of Guthrie, Okl., on the brief), for appellees.

Before CARLAND and KENYON, Circuit Judges, and JOHNSON, District Judge.

KENYON, Circuit Judge (after stating the facts as above). [1] Appellant's bill being dismissed, the allegations of fact therein are to be taken as true. Kansas v. Colo., 185 U. S. 125, 22 Sup. Ct. 552, 46 L. Ed. 838. These allegations, however, must be distinguished from conclusions of the pleader. The court will accept as true the allegations of fact in the bill well pleaded, but will not accept as true mere conclusions.

The question that presents itself at the threshhold of this case is whether or not the record shows a contract between appellant and appellees. Appellant's theory of the alleged contract is stated in the reply brief as follows:

"The first letter appearing in the bill is a positive direct offer to sell for the sum of $125,000.00 (Rec. p. 6). On page 11 of the record is a positive direct offer to purchase at the sum of $132,000.00 and signed by J. H. Miller, who was the president of the plaintiff at the time and had authority to bind it."

After the receipt of the first letter from Hemme to Stein, and the one of February 2, 1919, Stein evidently sought to procure a purchaser, and, after a great deal of negotiation, Bland, the associate of Stein, secured from one Miller an offer to pay $132,000, the same to be disposed of and divided as stated by Stein in his letter to Hemme of February 25, 1919; that is, $121,500 to Hemme, $4,000 to the Interior Oil & Royalty Corporation, the balance to be divided among the various brokers and real estate agents, and that Mr. Hemme, for himself and as agent for his wife, accepted over the telephone this proposition of Mr. Miller.

As appears by the allegations of the bill, after the appellees had received the letter from Stein of February 25, 1919, explaining the foregoing to them, they notified said broker and agent to bring his prospective purchaser to Stillwater, Okl., and that they would there close the deal upon the terms and conditions agreed upon as to the payment of money and "divisionally proceeds." It is upon these allegations and letters that appellant relies to establish a contract.

Is the claim well founded? Does the record show mutual assent and a meeting of the minds of the parties upon all of the terms of the proposed agreement? A review of the correspondence and of the allegations of the bill is necessary to work out a correct solution of these questions. It will be well, however, first to settle the status of Miller and Stein, who appear frequently throughout the record, and who are important figures in the transaction.

It is the theory of appellant that Miller was the agent of appellant, with authority to act, and that Stein was likewise an agent of the Hemmes, with authority to procure a purchaser, and that Bland was an associate of Stein. The record is not clear as to the scope of the authority of these agents. It is alleged on page 10 of the transcript of record that plaintiff (appellant) on the 13th day of February, 1919, authorized Miller, its agent and officer, to send the telegram to Bland,

which we have heretofore set out. That telegram is in reference to adding $1,000 to the commission. Again, on page 10 of the record, is the allegation that:

"Plaintiff, through its officer and agent, J. H. Miller, accepted all of the terms and conditions laid down in said telegram, and in writing agreed to pay the sum of $135,000.00 for said property," etc.

In the reply brief of appellant, in the statement which we have heretofore set out, it is claimed that Miller was the president of the plaintiff (appellant) company at the time of these transactions, and had authority to bind it, and that these allegations are in the bill. We find no allegations as to Miller's authority, other than those we have stated, and while there is a serious question as to whether the allegations are sufficient to show authority on the part of Miller to bind appellant, we assume for the purpose of this case that he had such authority.

[2] As to the authority of Stein, the early correspondence, especially the letter of February 12th from Hemme to him, would indicate that Hemme did not regard him as an agent, but looked upon him more as a prospective buyer. The later correspondence, however, shows that Hemme did expect to pay, and Stein expected to receive, a commission for his services; that Stein was his agent, with limited authority only, to secure a purchaser for Hemme; and that such purchase and purchaser were subject to the approval of both Mr. and Mrs. Hemme. Stein had no authority to bind either Hemme or Mrs. Hemme.

[3, 4] We pass to a review of the record in the quest to ascertain if any agreement was made between the parties as claimed by appellant. The point is stressed that the letter of February 1, 1919, contains a positive and direct offer to sell for the sum of $125,000. We do not so understand this letter. It makes a suggestion as to what it would take to secure Hemme's royalty. It invites discussion. There is nothing definite however, as to how the amount should be paid, when it should be paid, or the kind of title that should be transferred. It submits a question to Stein as to how much he wants out of it. This letter is a mere opening of negotiations, and is in reply to a letter of Stein, which does not appear in the record. There is no proposal of sale that could be accepted, and thereby a contract created.

In the letter of February 3, 1919, Stein speaks of $130,000 being paid for the property, he taking a $6,500 commission out of it, which, he states, will leave to Hemme "a net amount of $125,000 cash." There was nothing settled by this letter, except the inaccuracy of Stein's mathematics, as it is difficult to deduct $6,500 from $130,000, and have $125,000 left. Stein in this letter asks Hemme whether the price of $130,000, less 5 per cent. commission, is satisfactory. Certainly up to this time no terms proposed by any purchaser were accepted by Hemme. Stein in this letter seemed to be quite uncertain as to just what his authority was. It is to be noted in the postscript of this letter that Stein had submitted Hemme's property to Mr. Perry early in January, indicating quite a willing attitude on the part of

Stein to deal with Hemme's property before he had any authority whatever.

One Andrew Whitehead, alleged agent of plaintiff (appellant), first appears in the proceedings on February 13, 1919, by telegram to Bland; said telegram suggesting that deal can be made with Miller, if Bland will divide the commission with him. While he is the alleged agent of appellant, he was concerned over securing part of the commission that Bland, as an associate of Stein, seems to have expected. After Miller's telegram to Bland that he would add $1,000 to the commission, provided Bland divided with Whitehead, Bland seems to have been satisfied, and wired Miller that they had arranged to divide the commission in three ways, as appears in the telegram, hereinbefore set forth, of February 14, 1919. The three real estate agents, Whitehead, Bland, and Stein, having arranged the matter of the division of the commission satisfactorily among themselves, concluded that the entire matter had been adjusted. The commission and its division appear to be about the only proposition that the record shows was absolutely agreed upon.

The Miller telegram to Bland of February 15, 1919, accepting the proposition that Bland had made to Miller, which related almost entirely to the commission, expresses the wish to close the deal on the basis of total payment of $132,000. Stein then, on February 18th, after being advised of the Miller proposition, sent deeds to Mr. Hemme, with the letter of February 18th, asking that Hemme and wife execute the deeds. Stein, not hearing from Hemme, writes him the letter of February 22d, complaining that Hemme does not answer telephone calls, and threatens him with suit. He is told to "wire your answer to-day." Hemme does not wire, but on February 23, 1919, he replies by letter. This letter shows, either that Hemme did not have complete information as to the propositions made, or that they were not fully understood by him. He draws Stein's attention to the fact that at some previous time, when he had left him at the hotel at Tulsa, he had told him that he must talk the matter over with his wife. He also in this letter notifies him that it would be "best to close here where we are and where the records are"; notifies him, also, that his wife is not satisfied; advises him that the money must be put up in the bank at Stillwater on the proposition; refers to the old contract, evidently meaning the one made with Chaney, Webb, and Herring for sale of the property; and expresses disappointment over the situation as to that. He closes with these words, "My wife must understand fully and be satisfied." Evidently at that time there had been absolutely no meeting of minds. It is evident from this letter that Hemme was taking advice and that he had help in the preparation of the letter.

[5] After the letter of February 23d, which apparently gave notice to Stein that Hemme was not in the mind to enter into final negotiations, Mr. Stein wrote him the letter of February 25, 1919, heretofore set out, giving the full terms of the Miller proposal; and the record alleges, as we have previously stated, that the said defendants by phone requested Stein to bring the prospective purchaser to Stillwater, and

"they would there close the deal upon the terms and conditions agreed upon as to the payment of money and divisionally proceeds" (evidently meaning division of commissions). Whether or not a contract was entered into between Hemme and Miller rests, we think, largely upon the construction to be given this allegation. Is it an allegation of full acceptance on the part of Hemme to the Miller proposals?

In Miller's telegram of February 15th, he speaks of his wish "to close deal." In Stein's letter to Hemme of February 18th, he uses the term "finally close this deal." The allegation of alleged acceptance uses the term "close the deal," the same to be done at Stillwater. In Stein's letter of February 25th he speaks of finally "closing deal" at Tulsa. Further appears the statement that Bland and Stein and Gubser, attorney and agent for the plaintiff, went to Stillwater March 1, 1919, for the purpose of "closing the deal." The allegation of record is, not that Hemme agreed fully to all the terms and conditions, but that he agreed to the terms and conditions as to the payment of money and "divisionally proceeds" theretofore agreed upon. It cannot be said that here was a complete meeting of minds upon all questions. There was and is yet a question in the minds of the parties as to the kind of title to be conveyed and just what Miller was buying—whether royalty rights in land or rights to royalty that had accrued or would accrue from the operation of the five wells; whether he was to receive title to the fee, or whether that was to remain in Hemme; whether he was merely securing an interest in personal property or an interest in the land. Possibly this question remained open for final settlement at Stillwater. There is no allegation that Hemme accepted all the terms and conditions proposed by Miller; but, the allegation being that he accepted all terms and conditions as to certain things, there is a limitation upon a full acceptance, and it is quite fair to assume that other matters were necessary to be agreed upon "to close the deal"—to use the language repeatedly employed by the parties.

While this statement of alleged acceptance comes the nearest to showing a contract on the part of appellees of anything in the record, it still leaves the matter open until the parties arrived at Stillwater and there arranged "to close the deal." We do not think the language "to close the deal" refers merely to the drawing and delivery of papers and going through the necessary formalities to reduce to writing a completed agreement, but there were material matters on which the parties had not agreed. It is somewhat strange that this notification of acceptance was given in a telephone conversation on or about the 27th of February, 1919, in view of Hemme's refusal, as shown by the letters, to talk matters over on the telephone. He evidently had some suspicion of contracts closed in that way, as we find in Stein's letter of February 22d complaint that Hemme would not answer telephone calls, and in Hemme's letter to Stein of February 23d he advised him there was no need "of any phones." It may be noted, also, that in Stein's letter to Hemme of February 25th he refers to Hemme's dislike to talk over the phone, and requests Hemme to let him know by return mail when he will be in Tulsa with the deeds signed by himself and Mrs. Hemme.

However, accepting the allegation at its full face value, it does not

supply the necessary link in the chain of evidence to make a completed contract. The acceptance is limited by its very terms to the "conditions agreed upon as to the payment of money and divisionally proceeds" (the term "divisionally proceeds" as used in the record is evidently an error, and refers to division of commission). It should also be noted that there is no allegation that Mrs. Hemme was satisfied, or that the terms of the sale met the requirements of Mr. Hemme.

[6] Our discussion, so far, of the alleged contract, has been concerning Mr. Hemme's relationship thereto. Let us analyze the situation as to Mrs. Hemme. There were no communications with her on the part of Stein. His letters were directed to Mr. Hemme alone. Evidently Stein did not regard his alleged agency such as to require any authority from Mrs. Hemme, but contented himself with believing that whatever Mr. Hemme agreed to she would likewise agree to. It is charged in the bill that both appellees are the owners of the land in question, namely, the west one-half of the northeast quarter of section 13, township 19 north, range 5 east of the Indian meridian, Payne county, Oklahoma. That is an allegation that Mrs. Hemme is one of the owners of the land. Appellant cannot now claim, in the face of this allegation as to ownership, that Mrs. Hemme does not have an interest in the land equal to that of Mr. Hemme. It was an ownership in the property that could be conveyed only by her separate action. As bearing on this see section 3352, Revised Laws of Oklahoma 1910, reading as follows:

"Except as mentioned in the preceding section, neither husband or wife has any interest in the separate property of the other, but neither can be excluded from the other's dwelling."

[7, 8] If the alleged agreement here were for a transfer of interest in real estate, under the statutes of Oklahoma, an agent would have no authority to bind his principal in the transfer of such interest, unless the authorization were in writing (statute hereinafter set out). No such authorization had been given by Mrs. Hemme to Mr. Hemme, or to Mr. Stein. Outside of the question, however, of transferring an interest in land, Hemme had no right to bind her to any contracts concerning the said land, including the acceptance of the Miller proposals, without express authority from her. The only statements to show any right on the part of F. W. Hemme to act for Mrs. Hemme are certain allegations in the bill, such as: "The said defendant, F. W. Hemme, acting for himself and as agent for his codefendant, Mary Hemme." Another: "The said broker and agent of said defendants." Again the expression is used: "The said defendant, acting for himself and as agent for his codefendant." These are mere statements of conclusions. There is no allegation of any authority whatsoever on the part of Hemme to bind his wife, Mary Hemme. The mere statement that he was an agent for her, without any allegation showing the scope of his authority, or that his agency was of such general character as would enable him to make contracts for her, is insufficient to bind her in the manner appellant claims. Further, in the letter of February 23, 1919, from Hemme to Stein, he was put upon notice of the limitations on his authority, and that his wife must be satisfied.

[9] In the alleged telephone conversation between Hemme and Stein, accepting Miller's offer, it is claimed that "the said defendants had received the above and foregoing letter from their said agent and broker," etc. "The said defendants notified said broker and agent," etc. The letter referred to was addressed to only one defendant. Such notification evidently was for Hemme alone, the party who received the letter. There is no allegation in the record that he had authority to act for and to bind Mrs. Hemme to an acceptance of the terms set forth in Stein's letter of February 25th. Mrs. Hemme seems to have been practically ignored in this transaction from beginning to end. Should there be any doubt as to whether the allegations of the appellant show an agreement on the part of Mr. Hemme, such doubt cannot exist as to Mrs. Hemme. The entire matter, however, is vague and uncertain, and the minds of the parties never met. It will not be out of place to advert at this point to some fundamentals of the law of contracts as expressed in the decisions which bear on these alleged facts.

In Tilley v. County of Cook, 103 U. S. 155, 161 (26 L. Ed. 374), the court said:

"An offer of a bargain by one person to another imposes no obligation upon the former, unless it is accepted by the latter upon the terms on which it was made. Any qualification of or departure from them invalidates the offer, unless the same be agreed to by the party who made it."

The fact that the minds of the contracting parties must meet is simply stated in Richmond, etc., Railroad Co. v. Tobacco Co., 169 U. S. 311, 314, 18 Sup. Ct. 335, 336, 42 L. Ed. 759, where the court said:

"The contract is the concrete result of the meeting of the minds of the contracting parties. The evidence thereof is but the instrument by which the fact that the will of the parties did meet is shown."

As to the necessity of a complete meeting of minds, in Compania Bilbaina, etc., v. Spanish-American & Co., 146 U. S. 483, 497, 13 Sup. Ct. 142, 148, 36 L. Ed. 1054, the court said:

"But, if there is any part of it in regard to which the minds of the parties have not met, the entire instrument is a nullity, as to all its clauses."

Again in Fire Insurance Association v. Wickham, 141 U. S. 564, 579, 12 Sup. Ct. 84, 88, 35 L. Ed. 860, it was said:

"To constitute a valid agreement, there must be a meeting of minds upon every feature and element of such agreement, of which the consideration is one."

The term "contract," as used in the Constitution, is defined by the Supreme Court in Chase v. Curtis, 113 U. S. 452, 464, 5 Sup. Ct. 554, 560, 28 L. Ed. 1038, as follows:

"The term 'contract' is used in the Constitution in its ordinary sense, as signifying the agreement of two or more minds, for considerations proceeding from one to the other, to do or not to do certain acts. Mutual assent to its terms is of its very essence."

On this question of mutual assent of the parties, which is an important one here, we quote from the case of Utley v. Donaldson, 94 U. S. 29, 47 (24 L. Ed. 54):

"There can be no contract without the mutual assent of the parties. This is vital to its existence. There can be none where it is wanting. It is as indispensable to the modification of a contract already made as it was to making it originally. Where there is a misunderstanding as to anything material, the requisite mutuality of assent as to such thing is wanting; consequently the supposed 'contract does not exist, and neither party is bound. In the view of the law in such case, there has been only a negotiation, resulting in a failure to agree. What has occurred is as if it were not, and the rights of the parties are to be determined accordingly."

In National Bank v. Hall, 101 U. S. 43, 50, 51 (25 L. Ed. 822), it was said:

"In making a contract, parties are as important an element as the terms with reference to the subject-matter. Mutual assent as to both is alike necessary. ✶ ✶ ✶ There was no privity between the bank and the new firm. There was no binding acquiescence by the bank. There could be none without knowledge, and it is not claimed or pretended that such knowledge existed. A new party could no more be imported into the contract, and imposed upon the bank without its consent, than a change could be made in like manner in the other pre-existing stipulations. The bank might have been willing to contract with the firm as it was originally, but not as it was subsequently. At any rate, it had the right to know and to decide for itself. Without its assent a thing was wanting which was indispensable to the continuity of the contract."

Tested by these various elementary essentials of a contract, the record fails to show any completed agreement between the parties.

[10] While the conclusion expressed is determinative of the case, we refer to the interesting theory of appellant that the contract claimed by it was one giving a right to participate in the division of personal property, and amounted in effect merely to an assignment to it of the Hemmes' right to royalty under the contract with Crockett. On page 48 of appellant's brief this theory is expressed as follows:

"By this contract Hemme did not undertake to convey the land, or any interest therein, or indeed the oil and gas, but to assign and sell to the appellant his interest in a contract which gave him the right to participate in the division of certain personal property after it had been brought into existence. They still retained title to the fee and to the use of the demised premises, subject only to the rights and privileges granted by them to Crockett, their lessee. None of these rights did they undertake to convey to appellant, but his right to receive the one-eighth part of all the oil in the pipe lines to which the wells were attached."

Again, on pages 51 and 52 of appellant's brief, the thought is expressed as follows:

"Just what the rights of the purchaser of oil royalty, separate and apart from an assignment or transfer of the lease, may be, we are not called upon to consider, not being involved. But we are directly interested in the rights of the purchaser of the royalty, property essentially personal in its character. Such sale would not, in our judgment, affect the relation of lessor and lessee that theretofore existed between the landowner and Crockett, but would merely work a transfer or assignment of the consideration from the landowners to the purchaser, and that all of the rights would remain, unaffected by the sale, in the lessor."

It seems a long road to travel to accomplish what could have been easily done by a written assignment of the Crockett lease, if such were the intention of the parties. If the allegations of the bill could be tortured into expressing an agreement between Hemme and Miller, it is apparent that what Miller expected and what the agreement would

have to cover to carry out his expectation, would be a deed and title to the land. He was not seeking a mere transfer of rights to royalty after such had accrued, or an assignment of rights under the Crockett lease. He was not looking to any limitation of operation through the five established wells, but wanted such title as would enable him to develop the oil in the land to any extent his desire and capital might warrant. While, in some of the correspondence between Stein and Hemme, royalty rights are spoken of, yet it is apparent that Stein was trying to commit Hemme to the proposition of giving a deed. And while it is doubtful if Hemme had any clear idea of what he was expected to do, or what kind of an arrangement he was entering into, if any, and while it is true that he speaks in his first letter to Stein of selling his royalty, it is rather a fair inference, from all of the circumstances disclosed, that he was contemplating a deed of his land and getting rid of his property. For instance, on the 27th day of November, 1917, appellee, Hemme, and his wife made a contract to sell this same land to other parties for $90,000, and to make a warranty deed for the same. If Hemme was willing to make a warranty deed in 1917 for $90,000, when in 1919 he was to receive $125,000, it would be rather a fair inference that he expected to make a deed of all his interest.

We think the correspondence between the various parties, their agents and agents' associates, shows that a transfer of title to the land was in contemplation. We refer to some matters in the record bearing on this question. In the letter of February 2, 1919, from Hemme to Stein, Hemme speaks of giving a warranty deed of the place to a man in Tulsa, and states he is not able to give a clear title, because of the option given to Chaney, Webb, and Herring. On February 18, 1919, Stein writes to Hemme as follows:

"I am inclosing herewith deed as prepared by Dr. Miller's attorneys. If you will be here Thursday morning with same duly executed by yourself and wife, I know of no reason why we cannot finally close this deal."

Nothing is said here of any mere transfer of accrued royalty rights. It is perhaps unfortunate that the deed referred to does not appear in the record, as it might throw considerable light on the transaction and the intention of the parties. In the telegram of Miller to Bland of February 15, 1919, he requests that deeds be prepared. If the transaction were to be a mere assignment of rights under the Crockett lease, no deed was necessary. He does not ask for such assignment. That would have been the usual procedure, if such were the intention of the parties. There is nothing to indicate that Miller ever heard of the Crockett lease. He seemed to be in ignorance of the theory, now advanced, that he was merely buying a right to participate in a distribution of personal property.

On February 22, 1919, Stein writes to Hemme, demanding that they deliver title by the following Monday evening. In other places throughout the bill are found references to a deed of conveyance, and in the relief prayed for we find appellant demanding such deed of conveyance, and asking that, upon a failure to convey, the judgment of the court shall operate as a complete conveyance of all the interest and royalty rights of the said defendants in and to said premises by virtue of the

lease hereinbefore mentioned. Evidently something more than accrued royalty rights is intended by this language; otherwise, why use the language, "conveyance of all the interest and royalty rights"? We are satisfied from the record that it was the intention of Miller to secure an interest in real estate.

The laws of Oklahoma provide (fifth subdivision of article 2, under the headings of Contracts, 1 Laws of Oklahoma 1910, § 941):

> "Fifth. An agreement for the leasing for a longer period than one year, or for the sale of real property, or of an interest therein; and such agreement, if made by an agent of the party sought to be charged, is invalid, unless the authority of the agent be in writing, subscribed by the party sought to be charged."

The Crockett lease evidently was drawn under this section. The intention of appellant's agent by the alleged offer and contract being to secure an interest in land, and the intention of appellee Hemme, if he had any intention in the matter at all, being to convey his land, it would be necessary that any agreement carrying out this intention should be in writing.

[11] A contract can be made by letters and written memoranda sufficient to satisfy the statute of frauds; but it is universally held that such writings must be in themselves sufficient to create the contract, without resort to parol evidence to supply omissions. Atwood v. Rose, 32 Okl. 355, 362, 122 Pac. 929; Woodworth et al. v. Franklin, 204 Pac. (Okl. Sup.) 452, 459; Halsell v. Renfrow, 14 Okl. 674, 78 Pac. 118, 2 Ann. Cas. 286; Id., 202 U. S. 287, 292, 26 Sup. Ct. 610, 50 L. Ed. 1032, 6 Ann. Cas. 189; Bibb v. Allen, 149 U. S. 481, 13 Sup. Ct. 950, 37 L. Ed. 819.

[12] The letters and writings here do not sufficiently meet the test of the law to satisfy the statute of frauds. Appellant's theory that Miller was buying merely the right to participate in the division of personal property after it had been brought into existence is ingenious, but is not sustained by the record. In this connection it is of interest to note the language of the Supreme Court of the United States in U. S. v. Noble, 237 U. S. 74, 80, 35 Sup. Ct. 532, 59 L. Ed. 844, where the court said:

> "The rents and royalties were profit issuing out of the land. When they accrued, they became personal property; but rents and royalties to accrue were a part of the estate remaining in the lessor. As such, they would pass to his heirs, and not to his personal representatives."

Also see Woodworth et al. v. Franklin (Okl. Sup.) 204 Pac. 452, 458.

Appellant claims damage in the sum of $365,000 by the failure of appellees to carry out the alleged contract. It alleges that the property has had a large earning power, and that its royalty rights would have amounted to $150,000. That would be up to the time of filing the bill, which was December 10, 1920. As the contract was to be made on March 1, 1919, it would mean that in approximately 20 months appellant would have received $150,000 from its share of the royalty. If this is true, notwithstanding Mr. Hemme had originally suggested $125,-000 as the amount necessary to secure his royalty, the Hemmes apparently were not receiving a fair price for their interest, and these allega-

tions bear on the general question of a lack of equity in the case. 'It must be borne in mind, also, as the early letters written by Hemme show, that he was an ignorant man. One has but to read these letters to be cognizant of this fact. He had no fixed idea of what he wanted. He did not seem to know for a while whether Stein was a purchaser or an agent. He was dealing apparently with three skillful real estate agents, and in said dealing was not on an equal footing with them as to ability and skill.

Viewed from every standpoint, there is, we think, a singular lack of equity in this bill, and the trial court was right in sustaining the motion to dismiss the cause of action as set forth in plaintiff's (appellant's) second amended bill.

The decision is affirmed.