# COMPANIA BILBAINA DE NAVEGACION, DE BILBAO v. SPANISH–AMERICAN LIGHT AND POWER COMPANY.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 66. Argued December 1, 2, 1892. — Decided December 12, 1892.

Clauses in a charter-party of a vessel construed.

The owner of the vessel held not to be entitled to recover from the charterer any part of the expense of fitting up the tanks in the vessel to carry petroleum in bulk.

The owner could not affirm the charter-party for one purpose and repudiate it for another.

The charter-party never became a binding contract.

If there was any part of it in regard to which the minds of the parties did not meet, the entire instrument was a nullity, as to all its clauses.

Nor did the delivery of the vessel to the charterer, and her acceptance by him, constitute a hiring of her under the charter-party, as it would stand with certain disputed clauses omitted.

The delivery of the vessel was the adoption by the owner of the existing charter-party.

The owner could not collect rent for the time he was fitting up the tanks, and the charterer was liable to pay rent for the use of the vessel only while she was in his service.

THE case is stated in the opinion.

*Mr. James Parker* for appellant.

*Mr. George W. Wingate* for appellee.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

This is a libel *in personam*, in Admiralty, filed in the District Court of the United States for the Southern District of New York, by La Compania Bilbaina de Navegacion, de Bilbao, a corporation of Spain, as owner of the Spanish steamship Marzo, against the Spanish-American Light and Power Company, Consolidated, a corporation of the State of New York, claiming to recover $5520.97, with interest from August 4, 1886; $1800, with interest from May 21, 1886; $3300, with interest from June 21, 1886; and $8.14. The case is fully stated in the findings of fact hereinafter set forth.

The claim is made on a charter-party, a copy of which is annexed to the libel. It is dated December 14, 1885, at the city of New York, and purports to be made by the agent of the owner of the steamship and by the Spanish-American Company, and to let the steamship to that company for twelve months. The important clauses in it are those numbered 11, 12 and 18, which are as follows: "11. That the charterers shall have the option of continuing the charter for a further period of twelve months on giving notice thereof to owners thirty days previous to first-named term, and to have the liberty of subletting the steamer, if required by them. 12. That in the event of loss of time from deficiency of men or stores, break down of machinery, or damage preventing the working of the vessel for more than twenty-four working hours, the payment of hire shall cease until she be again in an efficient state to resume her service; and should she, in consequence, put into any other port other than that to which she is bound, the port charges and pilotages at such port shall be borne by the steamers' owners; but should the vessel be driven into port or to anchorage by stress of weather or from any accident to the cargo, such detention or loss of time shall be at the charterers' risk and expense." "18. Should steamer be employed

in tropical waters during the term of said charter-party, steamer is to be docked and bottom cleaned and painted, if charterers think necessary, at least once in every six months, and payment of the hire to be suspended until she is again in a proper state for the service ; charterers to have the privilege of shipping petroleum in bulk in water-ballast tanks, which are to be fitted for the purpose at owners' expense, satisfactory to charterers, and have permission to appoint a supercargo at their expense, who shall accompany steamer, and be furnished free of charge with first-class accommodations, and see that voyages are made with utmost dispatch."

The respondent appeared in the action, and put in its answer, denying that the libellant was entitled to recover any part of the $5520.97, admitting the payment of $1500 and $3300, and denying that it owed anything to the libellant. It alleged that the libellant never fitted up the centre water-ballast tank to carry oil in bulk, its use being consequently lost to the respondent; that the capacity of that tank was about 50,000 gallons, and its loss reduced the value of the vessel to the respondent $1100 a month from May 15, 1886, making a damage of $10,084; that from February 21, 1886, to August 27, 1886, the date of the bringing of the suit, was 188 days; that during that period the respondent was deprived of the use of the vessel forty-two days, leaving only 146 days for which hire was due; that such hire, at the rate of £675 a month, amounted to $16,060; that on account of such hire the respondent had paid altogether $15,137; that it was entitled to deduct from the moneys due on the charter-party $2390, for the expense to which it was put in procuring barrels so to transp t the oil, and for the charges connected therewith, and the fu ther sum of $10,084 for the damages which it would sustain by reason of the refusal of the libellant to fit up the centre tank to carry oil in bulk; and that it had filed a cross-libel to recover from the libellant so much thereof as exceeded the hire of the vessel claimed in the libel. :

The case was heard in the District Court by Judge Brown, and a decree was entered by that court on June 21, 1887, for the recovery by the libellant of $1800, being the balance of

hire unpaid for the vessel for the month beginning May 21, 1886, and for $117 interest thereon from May 21, 1886, and $95.73 costs, the whole amounting to $2012.73.

The opinion of Judge Brown is reported in 31 Fed. Rep. 492. He took the view that the charter-party signed by the broker of the libellant did not constitute a legal contract, binding upon either of the parties, because such broker, in signing it, exceeded his authority; that that fact was communicated at the time to the broker of the respondent; that it was agreed, between the brokers of the two parties, that, if the clause relating to the extension of time for twelve months, and the clause requiring the vessel to fit up the oil tanks at the expense of the owner, were objected to by the latter, the matter should be settled by negotiation; that the respondent from the first refused the charter unless the vessel should fit up the tanks at the expense of her owner; that that fact was stated to libellant's broker at the time; that the owner of the vessel subsequently refused to confirm these two clauses in the charter; that notice of such refusal was given to the respondent, and it never consented to waive those two clauses; that no agreement as to those two clauses was ever arrived at; that the subsequent conduct of each party showed that neither intended to recede from its position; that, when the vessel arrived at Philadelphia, ready for the first voyage, neither party made any inquiry as to the disputed clauses; that both parties assented to the use of the vessel on the first voyage, without any definite agreement on the disputed points, and without any settlement by negotiation; that the respondent did not object, because it was not ready to use the tanks; that, when it was ready to use them, and required that they should be fitted up by the libellant in pursuance of the terms of the charter-party, the libellant refused to do so; that the cargo was then taken in barrels, under a stipulation that that might be done without prejudicing the rights of either party, the respondent claiming damages for the extra expense; and that subsequently the libellant fitted up the tanks, claiming that the expense would be at the charge of the respondent, while the latter notified the libellant that it would not pay for any such expense.

The District Court also held that, although the charter-party as a whole never became a contract binding upon either of the parties, it might be referred to as fixing the rights of each in so far as it might be presumed to have been adopted by both parties in their subsequent acts; that the respondent was apprised of the verbal refusal of the owner to agree to the two disputed clauses of the charter-party; that, nevertheless, the vessel came to the respondent, and was tendered to it by the owner, without any attempt to settle the disputed points; that both parties consented to the first voyage without any settlement of those differences; that as soon, however, as any question was made between the master and the respondent, after the first voyage, the original refusal of the owner was made known to the respondent, and neither party ever agreed to the demands of the other party on the subject; and that the vessel was employed without either side yielding anything to the other as to the charter-party. The court further held, that, under that state of things, the terms of the charter-party constituted the implied agreement of the parties in the actual use made of the vessel, in everything except as to the disputed clauses; that neither party could found any claim against the other upon the clauses which the other always refused to accept, because, in the face of such refusal, no agreement to those clauses could be implied; that the libellant, therefore, could recover nothing for its expenditure in fitting up the tanks to carry oil in bulk, nor could the respondent by its cross-libel recover any damages because the tanks were not fitted up earlier; that for the same reason, the libellant could not recover for any time of the vessel lost while it was fitting up the tanks; that it lost nothing by that disallowance, because it did not appear that any more time was required to fit up the tanks, when the work was actually done, than would have been required when the vessel was brought over to the respondent; that the evidence showed that after the employment of the vessel had begun, neither party was desirous of insisting on its legal right to discontinue all further service by reason of the failure of the parties to come to an agreement upon the disputed clauses; that the rights and liabilities of the parties

were founded, not at all upon the written charter-party, but wholly upon their subsequent conduct in the actual use of the vessel; that the charter-party was applied by implication to those acts, so far as it presumptively indicated the intention of both parties, and no further; that there could be no implied promise or obligation in contradiction of the expressed refusal of either party; that the result was that neither had any claim upon the other for the damages set forth by them respectively; and that the libel and the cross-libel must be dismissed, except as respected the hire, if any, unpaid for the time of the actual use of the vessel by the respondent.

Both parties appealed to the Circuit Court. That court, held by Judge Lacombe, dismissed the cross-libel of the respondent, without costs of the Circuit Court to either party, and decreed that the libellant recover from the respondent the amount of damages and costs decreed by the District Court, viz., $2012.73 and $185.27 interest thereon, being a total of $2198.

Judge Lacombe, in his opinion, said that there was nothing to add to the opinion of the District Judge; that the findings made by the Circuit Court sufficiently showed upon what theory the decision of Judge Brown was affirmed; and that, as both sides had appealed, no costs of the Circuit Court were allowed to either party.

The Circuit Court filed original findings of fact and conclusions of law, on October 15, 1888; and on January 14, 1889, it filed supplemental findings of fact. The original and supplemental findings of fact are as follows, the latter being enclosed in brackets:

"First. On December 19, 1885, the Spanish-American Light and Power Company, Consolidated, by the signatures of its president and secretary, executed a charter-party of the S. S. Marzo, owned by La Compania Bilbaina de Navegacion, de Bilbao.

"Second. Said charter-party contained three clauses, as follows, viz.:" then setting forth clauses 11, 12 and 18.

"Third. The negotiations preliminary to the signing of said charter-party were conducted by Henry P. Booth, acting as broker for the said the Spanish-American Light and Power

Company, and William W. Hurlbut, acting as broker for La Compania Bilbaina de Navegacion, de Bilbao, and was signed by said Hurlbut as agent for said last-named company.

"Fourth. Prior to said signature Hurlbut stated to Booth that he had no authority from his principals, the owners of the ship, to give the option of the continuance set forth in clause 11, or to agree to the insertion in clause 18 of the words 'at owners' expense,' or to agree upon behalf of the owners that they would pay any part of the expense of fitting water-ballast tanks for carrying oil in bulk; [and that he would not sign the charter-party containing the said clause 11 and said words 'at owners' expense' until authorized by the owners, his principals; that he, Hurlbut, would cable for authority, or he would sign the charter-party with that clause and those words therein upon the condition that the said clause and words were not to be binding upon the owners of the vessel until approved by the said owners; that Booth thereupon agreed to said proposal made by Hurlbut; that thereupon said charter-party, containing said clause and words 'at owners' expense,' was taken by Booth to the office of the Spanish-American Light and Power Company, and was there signed by its president and secretary and manager, and was brought back to Hurlbut's office by Booth.]

"Fifth. Thereupon said Hurlbut signed the charter-party and wrote a memorandum to the effect that the charter-party was signed subject to the approval of the owners as to those two clauses. He at that time again announced to Booth his want of authority to incorporate those clauses, and that a copy of the memorandum should be sent with the copies of the charter to be furnished to Booth, as broker, for delivery to the charterers.

"Sixth. Prior to the time of the signature aforesaid Hurlbut had not in fact received from his principals any authority to bind them to a contract containing these clauses.

"Seventh. Upon being notified of the action of Hurlbut in signing a charter-party containing these clauses they refused to ratify his action in that regard.

"Eighth. The authority of Booth, the charterers' agent,

was limited to securing the execution of a charter containing these clauses. [Immediately after the signature of the charter-party, on December 19th, Hurlbut made a clean copy of the memorandum agreement, as follows, viz.:

"'NEW YORK, *December* 19*th*, 1885.

"'Spanish-American Light and Power Company, charterers S. S. Marzo.

"'SIRS: I have signed charter-party by authority contained in the cables received.

"'Should the two clauses, viz. : "Privileges of twelve months' extension," and the "fitting of ballast tanks for petroleum at owners' expense," be not accepted by owners it is understood that the same may be arranged or compromised by mutual consent by cable.

"'Yours truly, W. W. HURLBUT.'

"And on the following Monday enclosed three copies of the charter-party, with copy of said memorandum attached, and sent same to Mr. Booth, the broker of the charterers, with the following letter, viz.:

"'NEW YORK, *December* 21, 1885.

"'Messrs. James E. Ward & Co.

"'DEAR SIRS: I enclose three certified copies charter-party S. S. Marzo ; also letter for charterers to accept, covering the two conditions inserted in charter-party as understood on signing same.

"'Yours truly, W. W. HURLBUT.'

"These were received by Booth.

"That on the 11th January, 1886, Hurlbut sent to Booth information that he had received a letter, dated December 31, 1885, from the London brokers, as follows : 'Owners refused to give option continuation which was asked them. We cabled you this: owners only gave liberty to carry petroleum in ballast tanks; they never agreed to "fitted at their own expense." We are really sorry you put them in charter-party

without authority. Owners are certain to pitch into us;' and that he had also received cable information that the steamship Marzo was about leaving Bilbao for the United States.

"That on January 4th, 1886, the owners of the steamship (La Compania Bilbaina de Navegacion, de Bilbao), having received copies of the charter-party, wrote to Messrs. Walker, Donald & Taylor, the London brokers, as follows, viz.:

" ' BILBAO, *January 4th,* 1886.

" ' DEAR SIRS: We are in receipt of your favor of the 23d and 31st ulto. and the 1st inst. enclosing charter-party for the Marzo S. S. As we are completely ignorant of this time-charter business, being the first time that we fix any one of our boats in this way, we are not decided until we see clearly and experience what there may be left to prolong the T. C. for another twelve months. If we see, and this will be soon seen, that things go all right, etc., it is probable that we shall agree to it and even be disposed to fix any other of our boats if you can then place her, but for the present we regret not to be able to agree to the option of twelve moni_s more, nor can we admit that the cost for fitting the water-ballast tanks for carrying oil (petroleum) should be at steamer's expense, as we only, when accepting the terms of the charter, authorized the shipper to carry petroleum in water-ballast tanks, even (? never) thinking that besides our yielding to that condition they would ask us to spend money for it. As for the super-cargo, we agree to give him a first-cabin accommodation gratis on board, but he shall have to pay to the steward of the boat the food, as we do for the officers and crew. Marzo is now here in dry-dock and loads end of this week for Baltimore.

" ' Yours truly,       AZNAR Y ASTIGARRAGA.'

"Endorsement on margin: 'If delivery is accepted Baltimore, to whom must boat be delivered there, or whom Philadelphia or New York? Please wire before steamer leaves this port. As agreed, we suppose payment shall be made in London one month in advance.'

"That on January 9th, 1886, said Walker, Donald & Tay-

lor transmitted a copy of said letter to Hurlbut at New York, and the latter, on January 18th, enclosed copy to Booth, the broker for charterers.]

"Ninth. [That the steamship Marzo sailed from Bilbao on January 15th, 1886, for Philadelphia, where she duly arrived, and on the 18th of February was tendered to the charterers, who accepted her as in their service under the charter from the date of February 21st, 1886.

"That the charterers, after acceptance of the vessel on February 21st, loaded and despatched her to Cuba and return to Philadelphia, at which latter port she arrived about March 18th, 1886.

"That upon her arrival at Philadelphia, Smith, the manager of the charterers, went over to Philadelphia, and for the first time stated to the master of the vessel that it was possible something would be required to be done towards fitting the tanks for petroleum on the voyage next after the one for which she was loading, to which the master replied that he must be notified in time, because the owners understood the fitting of the tanks would be at the cost of the charterers, to which Smith replied, 'That will be arranged.'

"The vessel then for the second time proceeded to Cuba and loaded thence for Boston, arriving at the latter port early in May; that while the vessel was still in Boston the charterers wrote to the agents of the vessel at New York as follows:

"'New York, May 13th, 1886.
"'Messrs. Latasa & Co. City.
"'Gentlemen: We learn from the captain of the Marzo that he will complete his discharge at Boston to-day and that he will reach here to-morrow. We beg to again call your attention to the fact that we are now prepared to ship oil in bulk, and we shall expect the steamer to be put in proper condition to receive it this trip. We will gladly give you all the assistance we possibly can to hurry forward the work, for we do not wish the steamer to be unnecessarily detained any more than you do.

"'Yours very truly,        R. A. C. Smith, Sec'y.'

" And on May 17th, 1886, again wrote as follows:

" ' NEW YORK, *May* 17*th,* 1886..
" ' Messrs. Latasa & Co., agents for owners of S. S. Marzo.

" ' DEAR SIRS: Please take notice that we are prepared to ship -oil in bulk, in the water-ballast tanks of the steamship Marzo, and that, according to the terms of the charter-party, same are to be fitted up for the purpose at owners' expense, satisfactory to us. Until said tanks are put in the condition contemplated by said charter-party the payment of the hire of the vessel ceases.

" ' Yours very truly,    R. A. C. SMITH, *Sec'y.*'

." And also informed Latasa & Co. by another letter of the ' appointment of an engineer to supervise the fitting of the tanks.'

" That the letter of May 17th, above recited, was the very first intimation given to the owners, agents, brokers or master of the steamship by the charterers that the latter had not accepted the refusal of the owners to confirm the words ' at owners' expense,' inserted in the charter-party by Hurlbut without authority, as above recited.]

" Tenth. At the time of such delivery her owners supposed that the company was receiving her with the intention of fitting up the tanks 'at its expense, and the Spanish-American Company supposed that the owners were delivering her in accordance with the terms of the charter-party which it had signed.

" Eleventh. Upon her receipt and on or about February 21, 1886, the Spanish-American Company loaded and dispatched her on a voyage to Cuba and returned to Philadelphia, at which latter port the vessel again arrived on or about March 18th. The Spanish Company again loaded her; she proceeded to Cuba and thence to Boston, arriving at the latter port early in May.

" Twelfth. Thereupon the Spanish Company notified the ship's agents, Messrs. Latasa & Co., that it was prepared to ship oil in bulk and should expect the steamer to be put in proper condition as to tanks, etc., to receive it. ..

" Thirteenth. Discussion thereupon arose between the ship's agents and the manager (Smith) of the Spanish Company, the latter demanding that .the owners should fit the tanks at their expense and the owners expressing an entire willingness to fit the tanks, but refusing to pay the expense, which correspondence resulted in the following agreement, viz.:

" ' It is hereby mutually agreed by and between the owners and the charterers of the steamship Marzo that the said vessel shall proceed to load oil and coal for Havana, Cuba, pending the settlement of matters in dispute between said owners and charterers, and that said loading shall not prejudice the claim of either party to said charter-party.

" ' (Signed) R. A. C. SMITH, *Sec'y.*
" ' New York, May 26th, 1886.'

" And that a further arrangement was made by which $1500 was paid by the charterers on account of the vessel's hire that had already fallen due.

" Fourteenth. Upon return of the vessel to Philadelphia the Spanish Company again renewed the demand that the tanks should be fitted by the owners at their expense and refusing to pay hire until it was done, and the owners, through the ship's agents, again refused to pay the expense, but expressing an entire willingness to fit the tanks at the expense of the Spanish Company. Much correspondence ensued, but finally the owners, after notifying the Spanish Company that they would be held for the expense, to avoid further delay, proceeded to fit the tanks under the supervision of the engineer appointed by said company. The fitting was completed on July 30, and on that day the Spanish Company were notified that as soon as the bills for the expense thereof were received they would be presented to it for payment. They were so presented a few days later, amounting in the aggregate to the sum of $5520.97, but the said company refused to pay the same, [or any portion of the hire remaining unpaid, which hire amounts to the further sum of $5108.97, and have ever since refused to do so.]

" Fifteenth. The sum of six hundred and seventy-five pounds

British sterling, per calendar month, payable monthly in advance, was a fair and reasonable consideration for the use of said steamer during the time she was actually used by the said Spanish Company.

"Sixteenth. The said company has paid the owners of the Marzo for the use of said steamship at the said rate for said time during which she was so used, except the sum of eighteen hundred dollars which was due May 21, 1886, [but has not paid any hire for the time employed in fitting the tanks, viz., from July 3 to August 3, 1886."]

The conclusions of law accompanying the original findings of the Circuit Court were as follows:

"First. The charter-party signed December 18, 1885, was not a valid contract, because the agent of the owners had no authority to agree to the disputed clauses, and his action in signing a charter-party with such clauses contained in it was never ratified by said owners.

"Second. The Spanish-American Company never executed a charter-party with those clauses omitted, nor ever authorized any one to execute such a charter-party in their behalf.

"Third. The owners of the steamer never agreed with the Spanish Company that they would fit up the tanks at their own expense.

"Fourth. The Spanish Company never agreed with the owners that they would pay for the expense which might be incurred in fitting up the tanks.

"Fifth. For the actual use of the vessel, which, with the assent of the owners, the Spanish Company has enjoyed, it should pay a fair and reasonable rent.

"Sixth. The libel and cross-libel should therefore be each dismissed, except as respects the hire unpaid, (eighteen hundred dollars, with interest from May 21, 1886,) for the time of the actual use of the vessel by the Spanish Company.

"Seventh. The decision of the District Court is affirmed, without costs of this court."

There were no further conclusions of law accompanying the supplemental findings of fact.

The libellant has appealed to this court; but the respondent

has not appealed. The libellant contends, in this court, that it ought to recover all the items claimed in its libel, and not merely the $1800 with interest from May 21, 1886.

It is quite clear that the libellant could not, in any event, recover from the respondent any part of the expense of fitting up the tanks in the vessel to carry petroleum in bulk. There was nothing in the acts of the parties to throw on the respondent any obligation to fit up the tanks, or to pay the expense thereof, if the work should be done. The respondent never promised to make or to pay for any such alteration. On the contrary, it always refused to recognize any such liability on its part, and insisted it was the duty exclusively of the libellant to pay therefor. If the libellant chose to fit up the tanks, that was a voluntary act on its part in regard to work upon its own property, for which it has no remedy against the respondent.

It is contended, however, that, as the respondent refused to retain or use the vessel unless the tanks were fitted up by the libellant, as provided in the charter-party, an implied contract arose; and that, as the libellant did such fitting up, the respondent must bear the expense. But it is found, in effect, that the respondent always and constantly refused to assume the expense, and insisted, as the ground for the making of the alterations, that, under the charter-party it was the duty of the libellant to make them. No duress by the respondent is alleged in the libel, or shown.

The position of the libellant is, that, although the charter-party is a binding instrument on the respondent, so far as relates to the hire of the vessel, it has no effect against the libellant as to the provision contained in clause 18, as to the fitting up of the water-ballast tanks at the expense of the libellant, in order to have petroleum shipped in bulk. If the libellant seeks to enforce any part of the charter-party, it must rely on the instrument as a whole; and it cannot affirm the charter-party for one purpose and repudiate it for another. The respondent refused at all times to enter into an express contract that it would pay for fitting up the tanks; and the charter-party as executed indicated the respondent's inten-

tion not to do so. On the facts as found, no such contract can be implied. The charter-party never became a binding contract.

The contention of the libellant is, that the instrument became binding on the parties, with the exception of the particular clauses referred to, if the libellant should dissent from those clauses. Thus the same effect is claimed as if the charter-party had been returned to the persons who had signed it, and the clauses referred to had been erased by mutual consent. But if there is any part of it in regard to which the minds of the parties have not met, the entire instrument is a nullity, as to all its clauses. *Eliason* v. *Henshaw*, 4 Wheat. 225; *Insurance Company* v. *Young's Administrator*, 23 Wall. 85; *Tilley* v. *County of Cook*, 103 U. S. 155; *Minneapolis & St. Louis Railway* v. *Columbus Rolling Mill*, 119 U. S. 149, 151.

Nor did the delivery of the vessel to the respondent, and her acceptance by the latter, constitute a hiring of her under the charter-party as it would stand with the disputed clauses omitted. The proposition of Hurlbut to the respondent, on December 19, 1885, was that if the libellant did not agree to the two disputed clauses, those clauses should "be arranged or compromised by mutual consent, by cable." The libellant was apprised of that proposition prior to December 31, 1885, as on that day the London brokers of the libellant, Walker, Donald & Taylor, wrote to Hurlbut, the agent of the libellant, the letter of that date. On January 4, 1886, the libellant wrote to Walker, Donald & Taylor the letter of that date, and the latter, on January 9, 1886, sent a copy of that letter to Hurlbut at New York, and he, on January 18, 1886, enclosed a copy of it to Booth, the broker for the respondent. Without any direct communication with the respondent, and without receiving any communication from it, the vessel was dispatched to Philadelphia and tendered to the respondent on February 18, 1886, not a word being said at the time to the respondent as to the disputed clauses. On these facts, the respondent had a right to conclude that the dissent of the libellant from the two disputed clauses was not insisted upon.

It was important to the respondent to know promptly if the

charter-party which had been signed was binding; and it was the duty of the libellant, before delivering the vessel to the respondent, to have the latter understand distinctly that the libellant did not deliver her under the charter-party which had been signed. It is expressly found, in the tenth original finding of fact, that the respondent, at the time the vessel was delivered to it, supposed that the libellant was delivering her in accordance with the terms of the charter-party which the respondent had signed. Under these circumstances, the delivery of the vessel to the respondent by her master was, in legal effect, the adoption by the libellant of the existing charter-party, and not an acceptance of the vessel by the respondent with the omission from the charter-party of the two clauses in question. *Drakely* v. *Gregg*, 8 Wall. 242, 267.

The legal effect of the transaction was that the libellant thus waived its former objections to the charter-party whether it intended to do so or not. It follows that the libellant cannot claim rent for the use of the vessel during the time she was undergoing alterations. As the libellant was bound to pay the cost of fitting up the tanks, if it did the work, it cannot recover the rent for the time during which such work was being done. The loss of the use of the vessel by the respondent during the time the alterations were being made was a part of the expense of fitting up the tanks, the eighteenth clause of the charter-party meaning that the tanks were to be fitted at the expense of the libellant before the delivery of the vessel under the charter-party. No interpretation of the charter-party can be allowed which would permit the libellant to take its own time to fit up the tanks and yet collect full rent from the respondent during the time that work was being done, and while the respondent was necessarily deprived of the use of the vessel.

Moreover, the respondent, insisting that the libellant should fit up at its own expense the water-ballast tanks, delivered the vessel back to the libellant, which accepted her for that purpose and kept her for a month. This necessarily stopped the running of the rent under the charter-party. The respondent

can be liable to pay rent for the use of the vessel only while she was in its service. The libellant recovered all that it was entitled to recover.

*Decree affirmed, but without interest, and with costs.*