**SHAMROCK TOWING CO., Inc., et al. v. CITY OF NEW YORK et al.**

(Circuit.Court of Appeals, Second Circuit. December 20, 1926.)

No. 122.

1. **Appeal and error** ⊜⟳1011(1)—**Lower court finding, depending on reconciliation of testimony, will not be disturbed.**

Circuit Court of Appeals will not disturb lower court finding, when it depends on reconciliation of divergent or obscure testimony, given by witnesses who were present in court.

2. **Shipping** ⊜⟳54—**City and contractor held liable for damage to chartered scows carrying refuse, resulting from fire on dumps without available water apparatus.**

City and contractor for removal of city's refuse *held* liable for injury to chartered scows used in carrying refuse to dumps, resulting from fire because of failure to have water apparatus for keeping dump fires in hand.

3. **Shipping** ⊜⟳36—**City, requesting scows, without answering owner's correspondence as to fire hazard, will be held to have agreed to provisions therein.**

Where city, after correspondence from owner of scows relative to city's acceptance of fire risk thereafter, without answering correspondence, requested furnishing of scows, it will be held to have agreed to such provision.

4. **Indemnity** ⊜⟳9(1)—**Agreement to hold city harmless for negligent acts held only to cover cases where city's liability arose without its fault.**

Contractor's agreement to hold city harmless for its negligent acts and omissions will be held only to cover cases in which city's liability arose without fault on its own part.

Appeal from the District Court of the United States for the Eastern District of New York.

Libel by the Shamrock Towing Company, Inc., and another, against the City of New York, wherein respondent brought in the Manhattan Ash Removal Corporation. From a decree for plaintiffs against the Manhattan Ash Removal Corporation only, it appeals. Decree modified, so as to hold both respondents liable.

Appeal from a final decree in the admiralty of the District Court for the Eastern District of New York, holding the Manhattan Ash Removal Corporation solely responsible for damage by fire to certain scows, owned by the Shamrock Towing Company, and insured by the North British & Mercantile Insurance Company.

The owner and the underwriters sued the city of New York for damage to the scows, which were moored along the bulkheads at Riker's Island in the East River, on July 20, 1923, and which the owner had chartered by a demise to the city for the carriage of city refuse to the dumping grounds at that place. The city loaded them with refuse, and towed them to the bulkhead along the east side of Riker's Island, where they lay in company with others, eleven in all, awaiting discharge. On the 20th of·July a scow, owned by the city, caught fire, which spread to the Shamrock scows alongside, and did the damage in question. The libel was for breach of the charter for failure to return the scows in good condition.

The city brought in the Manhattan Ash Removal Corporation under the fifty-sixth rule, alleging that it had employed it to unload scows at Riker's Island under a contract by which it agreed to save the city harmless from any damages caused by its fault; that it had negligently fed the fires, which were always burning on the island, by dumping inflammable material without proper care, and that these had spread to the scows. The court held both the Manhattan Ash Removal Corporation and the city prima facie liable, but exonerated the city because of a provision

in the charter between itself and the Shamrock Company exempting it from liability for fire. The decree, therefore, went against the Manhattan Ash Removal Corporation alone, and it appealed.

The city had for many years used Riker's Island as a dumping ground. It built bulkheads along its north and east sides, brought loaded scows alongside, and its contractors used "diggers," or cranes, which discharged them upon dumps inside the bulkhead lines. These dumps were nearly always more or less afire, due probably to the character of the material deposited. Up to July 1, 1923, the unloading had been done by an earlier contractor, whose contract expired on that day, and to whom the appellant was the successor under a second contract. The first contractor had maintained water pipes upon the island near the dumps, with standpipes and the like, to put out fires as they arose, but as these were his property he took them away in the early days of July. The appellant had not had time to install new pipes and apparatus, and the scows were therefore without any protection against fire, except from the fireboats of the city, one of which was stationed about 30 minutes away.

On July 20th the appellant had two "diggers" alongside the north bulkhead, by which it was emptying the scows upon the dumps. Fire broke out on one of the dumps early in the morning of the 20th, which the "diggers" tried more or less successfully to smother by emptying water on it with a discharging bucket, after which they kept on dumping refuse from the scows. There was some confusion, if not contradiction, in the testimony as to whether the fire which did the damage broke out on one of the dumps, and spread under a northwest wind to the scows, or whether it broke out spontaneously on one of the city scows, as at times occurred.

In the charter between the Shamrock Company and the city, which was from day to day and might be terminated at the option of either party, the company had agreed that the city should not be responsible for fire. After continuing under this contract for 18 months, the Shamrock Company, on November 29, 1922, wrote the city that thereafter the charter rate of the scows should be $8 instead of $7 a day as theretofore. To this the city agreed on December 5th, with some conditions, among which one was that it should not be responsible for any fire damage to the scows, a repetition of the existing stipulation. This letter the company answered on the 22d, saying that the proposed conditions were acceptable, except that it would hold the city

responsible for any fires that might break out on any of its scows while under charter, unless these were caused by the carelessness of the bargees. This letter the city did not answer, but it continued to demand, and the owner to supply, scows which were put into the same service as before.

In the contract between the appellant and the city for unloading the scows, the appellant agreed to save the city harmless for all claims by the owners of scows for damages caused, while they were in the appellant's custody, either by its machinery or by its "negligent acts or omissions."

Hunt, Hill & Betts, of New York City (George Whitefield Betts, Jr., and H. Victor Crawford, both of New York City, of counsel), for appellant.

George P. Nicholson, Corp. Counsel, of New York City (Charles J. Carroll, of Brooklyn, N. Y., and John T. Condon, of New York City, of counsel), for appellee city of New York.

Foley & Martin, of New York City (William J. Martin, of New York City, of counsel), for appellee underwriters.

Alexander & Ash, of New York City (Mark Ash and Edward Ash, both of New York City, of counsel), for appellee Shamrock Towing Co.

Before HOUGH, HAND, and MACK, Circuit Judges.

HAND, Circuit Judge (after stating the facts as above). [1] That the fire started on the dump and spread to the scows seems to us borne out by substantially all the reliable evidence. It is quite true that all the testimony cannot be reconciled, but this is perhaps accounted for by the position of the witnesses, and their excitement at the time. Several came upon the scene after the first scow was ablaze; several were badly placed to observe; some were perhaps interested not to have the fire start ashore. It is difficult in such cases to reach an absolute conclusion, and we recognize that the material on the scows might itself start up; but the admitted fire on one of the dumps, to windward of the scows, and the positive testimony of several apparently disinterested witnesses would be enough to satisfy us, if in any case we did not feel bound to accept the finding of the District Court. Our duty to review questions of fact is of course undoubted, but we again repeat that a finding below will not be disturbed, when it depends upon the reconciliation of divergent or obscure testimony, given by witnesses who were present in court.

[2] This being true, it seems to us that the liability both of the city and the appellant is established. The island was a place chronically afire, either smouldering or blazing, as conditions changed. Every one knew this, and knew the dangers to which scows were exposed which lay alongside. For this reason the earlier contractor had set up a system of fire mains and appurtenant apparatus to spray the dumps and subdue the fires, when they became formidable. All this had gone, through nobody's fault, so far as appears, except in so far as it might be thought such for the appellant to fail to come to an accommodation with its predecessor. We rely on no such circumstance; it seems to us that to send scows to such a place, and discharge fresh refuse upon the dumps, without available water to keep the fire in hand, was to invite exactly what happened. The city, which sent them there, and the appellant, which discharged them, were both liable for their injury, because of the absence of any protection.

We cannot see even a plausible argument for the city, and that made by the appellant is scarcely more tenable. It says that the "diggers" effectually smothered the fire on the dump before putting on fresh refuse, chiefly relying for that conclusion upon the testimony of the men on the "diggers," who were naturally interested. Even admitting as much, though the conclusion is at best doubtful, there could be no assurance that the fires would not spring up again, exactly as they did; certain extinction was clearly impossible. Some fire protection was an essential condition to the operations of any contractor who discharged scows of that kind of material and in that place.

[3] So far we are in accord with the District Court, but we cannot agree as to the exoneration of the city under the terms of the charter. This was terminable at any time at the will of either party. The original rate had been $8 a day, but apparently this had been changed to $7 before November 29, 1922. When the Shamrock Company by its letter of that date announced that the rate should be restored, it terminated the existing contract and tendered another. This left it to the city to accept or refuse, the other terms remaining the same. The city did accept, and so far as concerned fire risk did not change the stipulations. It makes no difference, in our judgment, whether we read the other conditions of the city's letter of December 5, 1922, as new or old. If old, an unconditional acceptance may be spelled out, and the Shamrock Company carried the risk. Let us so assume. It remains none the less true that it had the power to terminate the charter at its will. This it did pro tanto by its letter of December 22, 1922, when it refused to carry the risk any longer, and, as it could not force upon the city a modified contract, the existing one was at an end. This put the city to its option of going on without that change, or of ceasing to call for performance. It was with this correspondence before it that it called for any scows after December 22, 1922; these letters were a part of the terms upon which any further dealings must take place, and the city's request was an acceptance of them until they were again modified. A contract was made, of which they were a part. Compania, etc., v. Spanish-American, etc., Co., 146 U. S. 483, 13 S. Ct. 143, 36 L. Ed. 1054; American, etc., Co. v. Atlantic Mill, etc., Co., 290 F. 632, 20 Ann. Cas. 1097 (C. C. A. 3); McKell v. Ches. & O. Ry. Co., 175 F. 321 (C. C. A. 6); The Cutchogue, 10 F.(2d) 671 (C. C. A. 2). The libelant had therefore not assumed the risk of fire.

[4] There remains only the question of the appellant's agreement with the city to hold it harmless for its "negligent acts and omissions." This seems to us only to cover cases in which the city's liability to the scow owners arose without fault on its own part. It is quite true that the loss was here caused by the appellant's act of discharging the scows without having proper fire protection, but it was also as much caused by the city's tender of the scows and insistence that the work should proceed. It would be a harsh and unreasonable construction of the words to extend them to such a case, in which the city could not even enforce contribution at common law. Union Stock Yards v. Chicago, etc., R. R. Co., 196 U. S. 217, 25 S. Ct. 226, 49 L. Ed. 453, 2 Ann. Cas. 525. Thus we need not consider whether in any case admiralty could take cognizance of the contract, even to the extent of using it to determine where between the two the loss should fall.

Decree modified, by holding the appellant and the city both at fault, and each liable for one-half damages. Libelant to have the usual remedy over, should execution fail for either half.