**WOODS HOLE OCEANOGRAPHIC INSTITUTION, Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

Nos. 80–1780, 81–1239.

United States Court of Appeals, First Circuit.

April 28, 1982.

J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., Edward F. Harrington, U. S. Atty., Boston, Mass., Leonard Schaitman and Al J. Daniel, Jr., Attys., Dept. of Jus-

tice, Washington, D.C., on petition for rehearing, for defendant-appellant.

Don M. Kennedy, Henry C. Dinger, and Goodwin Procter & Hoar, Boston, Mass., in response to petition for rehearing, for plaintiff-appellee.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, and WYZANSKI, Senior District Judge.*

WYZANSKI, Senior District Judge.

Case 81–1239 involves appeals from two February 9, 1980 judgments of the district court.[1] The first judgment allows Woods Hole Oceanographic Institution ["Woods Hole"] to recover from the United States government ["the government"] on its claim for a balance of unpaid charter hire for the use of R/V Alcoa Seaprobe ["Seaprobe"] during a period beginning August 2, 1977. The second judgment dismisses the government's counterclaim for breach of an implied warranty of seaworthiness. We vacate our opinion of December 14, 1981, and we consider, in turn, the claim and the counterclaim.

## THE WOODS HOLE CLAIM

On July 26, 1977 the Military Sealift Command ["MSC"] of the United States Department of the Navy, being interested in chartering R/V Seaprobe to join other vessels in underwater research activities, sent to Woods Hole a telex letter expressing the government's wish to charter Seaprobe for 38 days from August 2, 1977 to September 7, 1977 and inviting Woods Hole to provide its requested daily charter rate. The letter set forth the government's requirements, including the following:

10. Military Sealift Command proposes to use MSC research ship contract a proforma of which will be forwarded for

your perusal. In the interim any comments/responses which you may have to the foregoing will be appreciated.

The government's representative and principal negotiator, Worrall, testified in the district court that the government in using the term "proforma" meant to refer to "house forms" of research ship charters bearing the symbol "MSC Form 4330/26 (11–71)" and that he sent such a form on July 26 to Woods Hole.

Dinsmore, Woods Hole's negotiator, testified that Woods Hole never received such a form contract until October 1977 when the government sent a copy for execution. Dinsmore further testified that in July he received from the government a DD 633–4 form with the heading "Department of Defense Contract Pricing Proposal (Research and Development)" and also a cost data sheet and that he had supposed that they together constituted the proforma to which the telex, and the government's representatives, Worrall and Hayden referred in the preliminary negotiations.

On the same day the telex was sent—July 26—Woods Hole sent a letter which, so far as relevant, stated:

This responds to your request dated 26 July 1977 for a proposed charter for the R/V ALCOA SEAPROBE, August-September 1977, for NUSC, New London.

The Woods Hole Oceanographic Institution hereby proposes to operate the R/V ALCOA SEAPROBE in accordance with your request from 2 August 1977 to 9 September 1977 . . . . . it is proposed to operate on a fixed daily charter rate of $7,844.34 per day . .

On August 1 Worrall, urgently needing Seaprobe for service beginning the next day, initiated a telephone conference with Dinsmore. Dinsmore summarized the re-

---

* Of the District of Massachusetts, sitting by designation.

1. In case 80–1780 which is the first of the two *cases* (not judgments) before us, the government appealed from the district court's September 26, 1980 order. That was not an appealable order because it was not a final decision, and the court did not determine that there

was no just reason for delay in appeal nor did it expressly direct entry of judgment. 28 U.S.C. §§ 1291, 1292; Fed.R.Civ.P. 54(b); *North Carolina Nat. Bk. v. Montilla*, 600 F.2d 333 (1st Cir. 1979). Hence the appeal of that order must be dismissed for want of appellate jurisdiction. *Ibid.*

sult of the conversation thus: "There were two agreements by us . . . . . We agreed ▮ that the ship would sail on schedule [that is, the next day] . . . . . the fixed price we had quoted would be the maximum price, and [2] we would explore other means [particularly, changes in the terms used in treating food and fuel as elements entering into the daily rate] and . . . see if we could bring the price down." Dinsmore, however, also testified that Worrall, then, and Hayden on an earlier occasion "talked about a pro forma contract." The government made a more cryptic summary in its August 4 telegram and its August 8 letter. The August 4 telegram states:

> 1. This *confirms agreement* between Captain Dinsmore, Woods Hole Oceanographic Institute/F. Worrall, COMSC of 1 August 1977 wherein it was agreed that R/V Alcoa Seaprobe would perform services for Naval Underseas System Center New London Conn for period of about 38 days commencing on/or about 2 August 1977.
>
> 2. *Rates and terms subject to further negotiation but firm fixed rate will not exceed $7,844.34 per day* inclusive all costs. [Emphasis added.]

The August 8 letter virtually copies the telegram.

During the August 1 telephone conversation Worrall requested Woods Hole to fill in the DD 633–4 form and return it.

On August 1 Woods Hole inserted in the DD 633–4 form the daily charter rate which with appropriate additions amounted to $7,844.34, and then on August 2 returned that form.

On August 2, the actual charter began in New London.

On August 5 by telephone and on August 12 by letter, Woods Hole informed the government that it had considered a possible alternative to the $7,844.34 inclusive fixed daily rate for the charter but concluded that it "would be confusing and certainly not to your advantage." Woods Hole then said, "We are not in any position to negotiate [the fixed daily rate of $7,844.34] downward." To that communication the government never responded.

Seven or eight days were spent outfitting Seaprobe and loading it with government equipment. The vessel left port on August 10 with government personnel aboard and, after at least five and probably six days' transit, reached the research site. On August 24 Seaprobe's starboard engine suffered a major breakdown which could not be repaired at sea and its other engine was working at only half capacity. At that time the government had not completed the research for which it planned to use Seaprobe.[2] On August 25 the master of the vessel directed the vessel back to port because of the severe engine casualty. Although the master informed the representatives of the government of his decision, they did not make that decision, and it is not suggested that the government had any power to control his decision. Without receiving any permission from any authorized representative of the government, the master determined that the Seaprobe should proceed to the port of Woods Hole rather than to New London as contemplated by the charter.[3]

Thereupon Seaprobe departed leaving in the ocean government equipment valued at $3 million. En route to the port of Woods Hole Seaprobe had on an undisclosed date a rendezvous with a government LSD which had been at Bermuda and which took from

2. Robert F. LaPlante, the government's manager of the program for which Seaprobe was used, was on board Seaprobe when the breakdown occurred. He testified that "We were really in the middle of the business, and we had several more days of business to do." (A. 317).

3. We are not unmindful that Vernon P. Simmons, a naval officer who was aboard Seaprobe on August 25 but who was "not empowered to enter into any agreements" (A. 327)

testified that the master "asked us if there would be any difficulty in the sense that originally the ship was supposed to go to New London to offload. And by going to Woods Hole, that modified our plan. We basically said we thought we could accommodate Woods Hole if it was better for him, and at that time the master directed the ship proceed to Woods Hole." (A. 332).

Seaprobe "the transfer of a number of people who were on the vessel." On September 1 Seaprobe reached port at Woods Hole.

Throughout September 1977 Woods Hole vainly sought to have the government pay it for its use of Seaprobe. On September 29 Worrall informed Dinsmore that in order to obtain payment Woods Hole would be required to fill in and execute a proforma contract because "they [the government's disbursing officials] need a signed copy in order to complete their records." Worrall gave no indication, and Dinsmore did not know, that the filling in and execution of the proforma might diminish or alter Woods Hole's rights under the August 1, 1977 oral contract. Yet Worrall knew that the government "could use or attempt to use the off-hire clause to try to reduce the payment to Woods Hole."

On October 13, 1977 Worrall forwarded to Woods Hole an MSC Form 4330/26 (11–71), apparently already executed by the government. The form contained the following Article 13:

ARTICLE 13. OFF–HIRE CLAUSE.

a. Any loss of time for deficiency of men or stores, fire, breakdown, or damages to hull, machinery, or equipment, collision, grounding, detention by average accidents to ship or cargo, dry-docking for the purpose of examination or painting bottom, or by any other cause whatsoever not due to the fault of the Government, preventing the full working of the Vessel, the payment of hire shall cease for the time thereby lost in excess of eight (8) hours, provided, however, that when the period of time lost to the Government on any one occasion exceeds twenty-four (24) consecutive hours, hire shall be reduced for the entire period, including the first eight (8) hours, provid-

ed further that where the Vessel is unable to perform due to failure of the Contractor to man the Vessel for continuous service, all time lost for this reason shall be without hire . . . .

According to his own testimony, Dinsmore reviewed the form "fairly carefully," discussed with four persons the off-hire clause, and "we" came to the conclusion that it was a "reasonable representation" of the agreement which Woods Hole and the government had previously reached. "Our interpretation was that if the ship was not able to do its mission, we would not be paid. The ship would be off-hire. Our interpretation was that the ship was not able to do its mission for the full 38 days, therefore it was not proper to charge for the full 38 days. But the return home . . . is part of that mission." (A. 277–278) [The testimony set forth in this paragraph will for convenience be referred to as "Dinsmore's A. 277–278 testimony."]

On November 15 Woods Hole executed and returned to the government the MSC Form showing a charter period of 31 days from August 2 through September 1, 1977.

The government continued to withhold payment to Woods Hole of all of the charter hire. Then during March 1978 the government for the first time contended that it did not owe Woods Hole for the seven days of the voyage from the research site to Woods Hole because of the off-hire clause. Woods Hole disagreed, and on March 29, 1979 filed its claim with the Contracting Officer ("the C.O."), in accordance with § 6(a) of the Contract Disputes Act of 1978, 41 U.S.C. § 605(a) [hereafter "§ 6(a) of the Act"].[4]

On April 6, 1979 the C.O. rendered his decision in the form of a letter to Woods Hole. The C.O. stated that: "The sole dis-

---

4. Section 6(a) of the Contract Disputes Act of 1978, 41 U.S.C. § 605(a), provides:

All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision. All claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer. The con-

tracting officer shall issue his decisions in writing, and shall mail or otherwise furnish a copy of the decision to the contractor. The decision shall state the reasons for the decision reached, and shall inform the contractor of his rights as provided in this Act. Specific findings of fact are not required, but, if made, shall not be binding in any subsequent proceedings. . . . .

pute between your institution and the Command concerns the number of days for which charter hire is due..... Based upon a review of your operations, I have determined that, due to engineering failures of the ALCOA SEAPROBE, your institution is entitled to only 24 days of charter hire. In addition, the Redelivery clause permits this Command to construct a return voyage to the port of delivery, for which additional hire of two days is due. Consequently, I have determined that you are entitled to $203,952.84 for 26 days of operation in full and final settlement of your claim for charter hire .... [Woods Hole has a right either to an administrative appeal to the Armed Services Board of Contract Appeals or to] bring an action directly in the applicable Federal District Court which would have jurisdiction over admiralty claims arising from a Maritime Contract."

On May 2, 1979 the government paid to Woods Hole the aforesaid $203,952.84. On August 1, 1979 Woods Hole filed in the district court a suit in admiralty [5] seeking merely the balance of $39,221.70 (together with interest) due for 5 days of unpaid charter hire for the return voyage.

On October 18, 1979 the C.O. wrote Woods Hole a letter from which we need quote only the following:

Mr. John Steele

Woods Hole Oceanographic Institute

Woods Hole, MA 02543

Counterclaim of the United States to Woods Hole appeal of Contracting Officer's Final Decision serial 147 M–10–3 dated April 6, 1979.

Gentlemen:

This final decision is issued in response to the recent appeal by the Woods Hole Oceanographic Institution, Complaint No. 79–1514–MA filed in the United States District Court in Boston, and in light of additional facts recently brought to my attention by Counsel. I am advised that

the findings made in the April 6, 1979 decision are final and conclusive only if an appeal or suit is not timely commenced; if an appeal or suit is timely commenced, a final decision is not binding in a subsequent proceeding before a board or court.

As you may be aware, rules of court require that a defendant assert in his Answer every claim he has against the plaintiff; however, section 6(a) of the new Contract Disputes Act of 1978 also requires that all claims by the government against a contractor relating to a contract must be the subject of a final decision.

Hence, this letter is issued which modifies in substantial part my earlier decision. The information brought to my attention concerns the failure by Woods Hole to furnish skilled and experienced operators for the Honeywell 505 Bottom Navigation System as part of the crew of the R/V SEAPROBE.....

.     .     .     .     .

Counsel advises me that the failure of Woods Hole to provide a crew that could operate the R/V SEAPROBE over the full range of her capabilities as required constitutes a breach of the warranty of seaworthiness which Woods Hole owed to MSC. Since this breach frustrated the specific purpose for which the R/V SEAPROBE was chartered, MSC is entitled either to refuse to pay any charter hire or to sue for damages. Under the circumstances, the damages suffered by MSC are limited to the charter hire paid on May 2, 1979: $203,952.84.

This is the final decision of the Contracting Officer .....

On October 30, 1979 the United States filed in the district court its answer denying liability as to the claim made by Woods Hole, and setting forth a counterclaim alleging that Woods Hole "By failing to

---

**5.** Woods Hole invoked 28 U.S.C. § 1333 as the basis of the jurisdiction of the district court. That section does not include a consent by the United States to be sued. However, the United States gave consent by § 4 of the Contract Disputes Act of 1978, 41 U.S.C. § 603, providing that contractors' claims falling within the Act were governed by the Suits in Admiralty Act, 46 U.S.C. § 741 et seq., and the Public Vessels Act, 46 U.S.C. § 781 et seq.

furnish crew members who could operate the R/V SEAPROBE for the purposes for which she was chartered . . . . breached its implied warranty of seaworthiness which resulted in damages in the amount of $203,-952.84," which the government seeks to recover.

On September 1, 1980 the district court ordered that the counterclaim be dismissed on the ground that the claim had not been the subject of a § 6(a) decision by the C.O. On February 9, 1981 the district court entered summary judgment for Woods Hole on the government's counterclaim.

Following a *de novo* trial, and in accordance with its December 29, 1980 opinion, findings and conclusions, the district court on February 9, 1981 entered judgment for Woods Hole on its claim for $39,221.70 and interest, for 5 days of charter hire.

From those two judgments the government appealed.

■ For the following reasons we reverse the judgment for Woods Hole on its claim of $39,221.70 (and interest).

It is undisputed that the district court correctly found that in August 1977 Woods Hole and the government entered into a binding agreement[6] whereby Woods Hole chartered the Seaprobe to the government for 38 days beginning August 2, 1977 at $7,844.34 per day. In light of Dinsmore's A.277–278 testimony,[7] (despite the district court's contrary view) we are of opinion

that it is indisputable that the parties included in their binding agreement an *off-hire arrangement* "reasonably represented" by clause 13 of the MSC Form. That conclusive testimony makes it unnecessary for us to consider (1) whether Dinsmore had actually seen the MSC form before October 1977, (2) whether Worrall was correct in representing that Woods Hole's November 15 execution of the MSC Form was a formality which had no effect except to satisfy the accounting demands of the government's disbursing officers, and (3) whether the MSC Form executed on November 15, 1977 by Woods Hole and apparently earlier by the government constituted not only a memorial of the parties' August agreement but also a subsequent agreement. See Restatement (Second) Contract § 27, Comment d.

We turn to the question whether as a matter of interpretation the off-hire clause relieves the government of an obligation to pay charter hire for the 7 days August 26 through September 1 when Seaprobe was en route from the research site to the port of Woods Hole. The essential words in the clause provide that "any loss of time . . . by any cause whatsoever not due to the fault of the Government, preventing the full working of the Vessel, the payment of hire shall cease."

The evidence indisputably shows that the government suffered a "loss of time" from the moment when the master of Seaprobe, acting for Woods Hole and not for the

---

**6.** There is no evidence that either Woods Hole or the government manifested or indeed intended that the August 1977 agreement should not be binding until other terms were assented to or until the whole bargain had been reduced to writing. *See* Restatement (Second) Contracts § 27, Comment c. The government's August 4 telegram and its August 8 letter recognize that there is a binding agreement, but also recognize the possibility that it may be modified.

**7.** Captain Dinsmore's A.277–278 testimony reveals not only that he and his consultants regarded the printed Article 13 off-hire clause in the MSC Form as a reasonable representation of the off-hire arrangement included in the August 1977 binding agreement, but also that Woods Hole, *recognizing the binding force of the off-hire arrangement,* billed the government for only 31 of the 38 days covered by the

August 1977 binding agreement. Dinsmore has never testified that Woods Hole was not bound by the off-hire arrangement or that the off-hire arrangement was not fairly represented by the text of Article 13 of the MSC form; the position he takes is that Woods Hole is not bound by an interpretation of the off-hire arrangement or the off-hire clause which relieves the government from liability for days earlier than September 2. Thus the issue for this court's determination is not the *existence* of an obligation in the precise terms of Article 13 of the MSC Form, but the *interpretation* of that obligation. In short, the district court erred, as we did in our withdrawn opinion, in finding that Woods Hole and the government were not bound by the off-hire terms set forth in Article 13 of the MSC form.

government, directed the vessel to proceed from the research site to the port of Woods Hole. It was not for the government's purposes that Seaprobe left before the planned research was completed, and went to Woods Hole for repair. The voyage to Woods Hole was not on the government's time, but on the time of Woods Hole. The off-hire clause relieved the government from any *contractual* obligation to pay for the time Seaprobe was in the service of Woods Hole. A charterer is obligated to pay "for the use of the vessel *only* while she was in its service." [Emphasis added.] *Compania Bilbaina de Navegacion de Bilbao v. Spanish American Light & Power Co.*, 146 U.S. 483, 499, 13 S.Ct. 142, 148, 36 L.Ed. 1054 (1892). Acc. *Hogarth v. Miller*, [1891] A.C. 48; *Steamship Knutsford Co. v. Barber & Co.*, 261 F. 866, 870 (2nd Cir. 1919).

The facts do not support the argument of Woods Hole that the government was using in its service, in the sense of employing, Seaprobe from August 26 through September 1 to bring the vessel and the government's personnel to the port of Woods Hole. During those 7 days the government had no power to direct or control the vessel's movements. The master had in effect terminated the charter and, acting for the account of Woods Hole, was taking Seaprobe to the port of Woods Hole to be repaired. If the master, acting for Woods Hole employed Seaprobe in Woods Hole's service to confer an incidental benefit on the government by transporting its personnel to a rendezvous or elsewhere, this does not imply that the *government employed* Seaprobe in its service to realize that benefit. Charter hire is payable only if the *charterer* employs the vessel in its service, not if the *owner* employs the vessel in a way that incidentally benefits the charterer.

We need not decide whether if Woods Hole did employ Seaprobe on the return journey for the incidental benefit of the government, the government has a quasi-contractual obligation to pay Woods Hole on a *quantum meruit* basis. The complaint in the instant case presents no such claim.

In short, the district court should have dismissed on its merits the complaint of Woods Hole because Seaprobe was not in the government's service during the 5 days for which recovery was sought.

## THE GOVERNMENT'S COUNTERCLAIM

■ The government alleged as a counterclaim that by failing to furnish suitable crew members Woods Hole broke the warranty of seaworthiness which was an implied contractual promise.

The district court had jurisdiction to hear the counterclaim both because of the compulsory counterclaim provisions of Fed.R. Civ.P. 13(a) and because of the court's admiralty jurisdiction. 28 U.S.C. § 1333.

Absent a statute providing otherwise, the government, like any other person, may without express statutory authority bring suit against an ordinary person (including a private educational corporation) for breach of contract.

Hitherto, the parties, the C.O., the district court, and this court in its now withdrawn opinion had *assumed* that if the government's counterclaim was based on its claim that Woods Hole had broken a charter contract, the government had to comply with § 6(a) of the Contract Disputes Act of 1978 and, consequently, had to allege and prove that the claim had been the "subject of a decision by the contracting officer." Cf. *Crown Coat Front Co. v. U. S.*, 386 U.S. 503, 512, 87 S.Ct. 1177, 1182, 18 L.Ed.2d 256 (1967); *United States v. Holpuch Co.*, 328 U.S. 234, 239–240, 66 S.Ct. 1000, 1003, 90 L.Ed. 1192 (1946).

However, that assumption was incorrect. § 16 of the Act, which was enacted November 1, 1978, 92 Stat. 2391, see note 41 U.S. C.A. § 601, provides:

Sec. 16. This Act shall apply to contracts entered into one hundred twenty days after the date of enactment. Notwithstanding any provision in a contract made before the effective date of this Act, the contractor may elect to proceed under this Act with respect to any claim pending then before the contracting officer or initiated thereafter.

The first sentence of that section impliedly precludes the application of the Act to any and all claims arising out of contracts entered into before March 1, 1979. But the second sentence permits a *contractor* to elect to proceed under the Act with respect to claims pending on November 1, 1978 or initiated thereafter. We construe that permission as limited to claims of the contractor, not of the government.

Woods Hole is mistaken in its contention that a government claim arising out of a contract with respect to which the contractor had made a claim pending at the time the Act was enacted is subject to the Act. The Act does not so provide, but is limited to the right of the contractor to proceed under his own claim. To be sure, it might be more convenient if the opposing claims were both initially heard by the C.O. But Congress did not so provide. And the action of the government in proceeding before the C.O. with its claim under a pre-1979 contract cannot have the effect of extending the statute's coverage.

Nor can we agree with the contention of Woods Hole that it is now too late for the government to draw our attention or for us to decide that the Act does not apply to government claims under contracts entered into before March 1, 1979. Although we deplore the failure of the government earlier to draw that point to our attention, we deem it inappropriate for us to decide this case on the basis of what we now perceive to be an inapplicable statute.

Our decision in *Carr v. Federal Trade Commission*, 302 F.2d 688, 691–693 (1st Cir.

1962) is distinguishable. There after we had decided that an item was "wool" and not a "wool product," the FTC petitioned for rehearing on the ground that we had not taken into consideration twenty years of FTC administrative rulings. Our denial of the petition rested on the ground that it was inexcusable for the FTC not to have earlier brought to our attention its own rulings with which it was "best familiar." In the case at bar our initial error was not attributable to some material available to the losing party but not to us. Our initial error was due to failure of all the parties and of ourselves to read with sufficient care the text of a statute before all of us. There is no equitable reason why the government should be precluded from calling our error to our attention. The government did not conceal anything. It was no more at fault than Woods Hole in misleading us. Indeed it was Woods Hole rather than the government which relied on the alleged relevance of the Act, and particularly § 6(a) thereof, to the government's counterclaim. It is both appropriate and desirable for us to correct our own error in failing to read a section of a public statute which was before us for interpretation and application.

To sum up the matter, our further consideration of the text of the statute convinces us that the second sentence of § 6(a) does not apply to the *government's* claim against Woods Hole because that claim arises out of a contract entered into before March 1, 1979. Hence, the district court erred in dismissing the counterclaim on the ground that the claim it presented had not been the subject of a § 6(a) decision by the C.O.[8]

---

**8.** We do not find it necessary to consider whether if a government claim is one covered by § 6(a) of the Act, Congress empowered the C.O. to decide such claim *ex parte* without giving the contractor any kind of advance notice or opportunity to be heard. With respect to this open question the government has drawn to our attention the following items of legislative history to support the view that the "decision" required by the second sentence of § 6(a) is not an adjudication but a unilateral executive determination made by a subordinate of one of the contracting parties to allow his superiors to correct obvious mistakes. *Hearings before the Subcommittee on Administra-*

*tive Law and Governmental Relations of the House Committee on the Judiciary on H.R. 664 and Related Bills, Serial No. 34*, 95th Cong., 1st Sess. 93 (1977). *Joint Hearings Before the Subcommittee on Federal Spending Practices and Open Government of the Senate Committee on Governmental Affairs and the Subcommittee on Citizens and Shareholders Rights and Remedies of the Senate Committee on the Judiciary on S. 2292, S. 2787, and S. 3178*, 95th Cong., 2d Sess. 178–179 (1978). *See* 124 Cong. Rec. 36231–32, 36262–76 (1978). The government, relying on *Lichter v. United States*, 334 U.S. 742, 791–93, 68 S.Ct. 1294, 1319–20, 92 L.Ed. 1694 (1948), contends that constitutional-

Woods Hole contends that, even if the district court gave an erroneous ground for dismissing the counterclaim, the dismissal was proper because the government did not promptly raise the question of Woods Hole's alleged breach of contract, but waited until Woods Hole brought in the district court this action for 5 days unpaid charter hire. Woods Hole suggests that this late claim is barred by laches and by its retaliatory purpose.

The suggestion that the government has been dilatory and retaliatory fails to recognize that neither the Contract Disputes Act of 1978 nor any other law requires the government to raise before the C.O. any claim it may have under a 1977 contract, *even if the contractor involved in that contract has,* pursuant to § 16 of the Act, *presented his claim arising out of that contract.* Inasmuch as the government was not required to make before the C.O. its claim either as an independent matter or as a counterclaim, we do not find that the government in waiting for 2 years and 2 months after the alleged breach of contract before it filed its counterclaim in the district court was guilty of laches. Nor was it at fault in waiting to file its counterclaim until it saw whether Woods Hole would prosecute in court its claim for charter hire for the 5 days from August 28 through September 1.

So far as we are informed, the government had never represented that it would not file an action in court with respect to the contract. When the C.O. made his April 6, 1979 decision, he had before him only such documents as Woods Hole submitted. It does not appear that in the proceedings before the C.O. the government stipulated that it would *never* raise any question as to the alleged breach of the contract by Woods Hole's failure to furnish appropriate crew members. All that the C.O.'s decision letter recited is that "The sole dispute between your Institution and the Command concerns the number of days for which charter hire is due under the contract." That does not imply that the government abandons any claim of a different nature which it might raise by an independent action in the district court or by a counterclaim to any *de novo* court action brought by Woods Hole.

The recital in the C.O.'s April 6, 1979 decision letter addressed to Woods Hole that "you may bring an action directly in the applicable Federal District Court which would have jurisdiction over admiralty claims arising from a Maritime Contract" does not take any position on the question of what would be the scope of the issues before the district court. It cannot rightly be said that the letter is an invitation to take the case to a tribunal which has a hidden trap in the form of a potential government counterclaim which may impose upon the contractor a liability to which the contractor could not otherwise be subjected. The government's claim of unseaworthiness did not need to be presented by a counterclaim to Woods Hole's action; the government could have brought an independent action before Woods Hole brought this action.

In Case 81–1239, judgment dismissing the government's counterclaim reversed; judgment in favor of Woods Hole on its claim reversed, with direction to the district court to enter a judgment dismissing the complaint against the United States.

Appeal in Case 80–1780 dismissed for want of appellate jurisdiction.

---

ly it is not necessary for the C.O. to give notice and opportunity to be heard, because the con-tractor before he is required to comply has the opportunity to be heard.